STATE, Respondent, *v.* GUNN, Appellant.

(No. 6,533.)

(Submitted September 27, 1929. Decided October 16, 1929.)

[281 Pac. 757.]

554

Mr. *W. E. O'Leary* and Mr. *R. L. Clinton*, for Appellant, submitted a brief and argued the cause orally.

Mr. *L. A. Foot*, Attorney General, Mr. *T. H. MacDonald*, Assistant Attorney General, and Mr. *Louis P. Donovan*, for the State, submitted a brief; Mr. *MacDonald* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

The defendant, by verdict of the jury, was found guilty of murder in the first degree and, by judgment of the court,

sentenced to life imprisonment. His motion for a new trial was denied and this appeal taken from the judgment and the order denying the motion.

The defendant admitted the homicide and attempted to justify it on the ground of self-defense. The principal contention on appeal is that the evidence is insufficient to support the verdict of murder in the first degree.

Murder in the first degree is defined by section 10955, Revised Codes of 1921, as follows: "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, or perpetrated from a deliberate and premeditated design, unlawfully and maliciously, to effect the death of any human being other than him who is killed, is murder of the first degree."

In order to sustain a conviction of murder in the first degree, the burden rests upon the state to establish not only the killing by the defendant but also to prove deliberation and premeditation. (*State* v. *Kuum*, 55 Mont. 436, 178 Pac. 288; *State* v. *Colbert*, 58 Mont. 584, 194 Pac. 145.)

It is the contention of defendant that there is no credible evidence in the case to warrant a finding that the killing was done with deliberation or premeditation. The homicide occurred in the early morning of July 21, 1928. The defendant at that time was running a roadhouse near Sweet Grass. About 9 o'clock in the evening of the twentieth day of July, Paul and O. J. Carney and Ed. Kasten came to the roadhouse. This was the first time the defendant ever saw them. While at the roadhouse, drinks were ordered by them and served by defendant Gunn, Kasten drinking beer and the Carneys drinking whisky. One of the drinks was paid for by Kasten by means of a $10 bill. Through mistake defendant gave him back $2.50 in change when he should have given him $7.50. Upon his attention being called to the mistake, defendant "in a gentlemanly way," as Kasten said, gave him his additional change and so far as Kasten was concerned the incident

was closed. According to the testimony of O. J. Carney, the defendant, upon having his attention called to the fact that he had not given Kasten sufficient change, stated "get it if you can." There is a conflict in the testimony as to some of the details of the altercation that took place at the roadhouse. It satisfactorily appears, however, that the Carneys were under the influence of intoxicating liquor, were boisterous and quarrelsome and created a sufficient disturbance so that the defendant caused a telephone message to be sent to Sweet Grass for help. Before help came, the Carneys and Ed. Kasten left the roadhouse in their automobile, a Dodge coupe, and started homeward on the main road from Sweet Grass to Shelby. At a point about one-half mile south of Sweet Grass and about the same distance from the roadhouse by the traveled road and 1,590 feet by air-line, their engine stalled. The lights on the car were turned off. The Carneys went to sleep in the car, Kasten remaining awake. O. J. Carney occupied the position at the wheel, Paul was next to him and Kasten sat at the right. About 1 o'clock in the morning, and about two hours after the Carneys and Kasten had left the roadhouse, the defendant, with Bertha Erickson, started for Shelby in his car to keep an appointment to meet his wife who was to arrive in Shelby at about 5:00 or 5:30 A. M. from Havre. He overtook the Carney car standing in the road. It was at this point that the deceased, Paul Carney, was shot by the defendant.

There is a sharp conflict in the evidence as to the order of events culminating in the shooting. It appears that when the defendant overtook the Carney car he stopped his car so that the front wheels of his car were about four feet to the rear, and about five feet to the left, of the Carney car. The lights on the defendant's car were left burning. The record is replete with evidence that the ground in front of and to the side of the Carney car was torn up; pieces of gold and silver coins, admittedly belonging to O. J. Carney, were scattered about, and the watch of O. J. Carney was found on the ground disconnected from the chain. The evidence dis-

closes that the hook or snap on the chain had been straightened out. A flashlight, with the glass broken, was also found on the ground. There is no conflict in the evidence as to these physical conditions existing at the place of the homicide. That a desperate struggle was staged there is certain, in view of the conditions shown to exist. Additionally, it appears from the undisputed evidence that immediately after the homicide blood was running from the mouth, nose, eye and ear of the defendant; his eyes were swollen and discolored and both bones of his right leg were broken so that he was unable to sustain any weight upon it. He also had a bruise over his right hip. Photographs and X-rays of the defendant, taken shortly after the homicide, were introduced in evidence, revealing the injuries above mentioned. As a result of his injuries he was confined in a hospital from the time of the homicide until the eighth day of December. Doctor S. E. Keenen, who treated him at the hospital, described the fracture of the bones as a spiral longitudinal fracture and said it was usually caused by a twist.

Defendant contends that the evidence offered by the state is so unreasonable and improbable, and so contrary to the undisputed facts, that it is unworthy of belief and cannot be accepted as the basis for a verdict of murder in the first degree.

The state's version of what transpired at the time of and immediately prior to the shooting rests upon the testimony of O. J. Carney and Ed. Kasten. Bertha Erickson, the only other eye-witness, was subpoenaed by both the state and the defendant, but could not be found at the time of the trial.

Kasten testified that when defendant overtook the Carney car he stopped, alighted from his car, knocked on the door of the Carney car and "hollered"; that the Carneys were then sleeping; that the witness opened the door of the Carney car, which he said was then closed; that the defendant held a flashlight in his left hand and a revolver in his right hand. According to this witness, the defendant said, "What are you doing there?" to which he replied that the Carneys

were drunk and asleep; that the defendant then said, "Oh, it is you sons-of-bitches—I thought I would overtake you. I am out of my joint now, if you want to fight"; that he then beat O. J. Carney over the head with the gun three times while Carney was in the car; that then O. J. Carney started to get out of the car and the defendant hit him once more after he was out of the car and knocked him down; that when O. J. Carney fell he "hollered" and Paul Carney awakened, got out of the car and made a couple of passes at defendant; that he saw Paul Carney with his left hand raised in the air and held by defendant's left hand, heard a shot fired, and saw Paul Carney sink to the ground. He said that Paul Carney and defendant were both on their feet with their left hands in the air when the shot was fired. He then said he heard a woman's voice say, "Come on, Frank, you have done enough now," and that then the Gunn car started and ran over O. J. Carney while lying on the ground.

O. J. Carney testified that after his car stalled on the road he went to sleep and the next thing he remembered was a man speaking. He said the defendant stated, "Here you are, you sons-of-bitches. I knew I would catch up with you." At that time, the witness said, he was awake trying to start his car; that he had his right hand on the switch and his right foot on the starter. He said that the window of his car was open at that time. When defendant spoke, the witness said he raised up and was hit on the cheek by the defendant with a hard instrument; that defendant struck him a second time, this time above the eye, and this rendered him unconscious. The next thing he remembered was when the Gunn car started to run over him; he also heard the statement by the woman, "Come on, Frank, you have done enough." He said the Gunn car ran over him and that he again became unconscious and remembered nothing more until Ed. Kasten told him that Paul had been shot.

It will be noted that, according to the state's case, no struggle took place at the scene of the homicide. No explanation was offered by the state as to how the money or watch

happened to be found on the ground at the place of the tragedy. The state's version of the events leading up to the shooting leaves the condition of the ground unaccounted for and the cause of defendant's injuries to conjecture and speculation. The state's evidence is in direct conflict with the known and undisputed facts. Physical facts are often more potent in the ascertainment of truth than sworn statements of witnesses. Such are the facts in this case. The physical facts demonstrate conclusively that a struggle ensued at the place of the homicide and refute the story of the state's witnesses as to what transpired. It should be noted, also, that the defendant's evidence does not supply the deficiencies in the state's case so as to justify a verdict of murder in the first degree.

Defendant's version of what happened at the time of the homicide was as follows: When he stopped his car he got out and offered assistance to the occupants of the Carney car, not knowing at the time who was in the car; that O. J. Carney said, "God damn you," and started to get out of the car and "hollered" to Paul, saying, "Come on, Paul, we have got the son-of-a-bitch"; that O. J. Carney started hitting the defendant; that the defendant backed down the road toward the front of the Carney car and in the light of his own car; that O. J. Carney kept striking at him and defendant struck O. J. Carney several times and, being unable to stop him with his fists, defendant struck him two or three times with his flashlight. They clinched and scuffled for a time and defendant finally got on top of O. J. Carney and jumped on his ribs with his knees, at which time Paul Carney jumped on defendant's back and threw him over backwards, and after some scuffling defendant and Paul Carney got up and Paul Carney in some manner got a twist around defendant's leg and threw him backwards, jumped on him and held him down trying to pound his head into the ground. Defendant requested Paul to get off; that he was hurting his leg, to which Paul replied, "Get off of you, hell, I am going to kill you, you son-of-a-bitch." The defendant then told him that if

he did not get off he was going to shoot, and Paul said, "Go ahead and shoot, you haven't guts enough, God damn you," and that thereupon the defendant, while lying on his back, shot him. When defendant shot, he said, Paul had his left hand raised and defendant thought he was about to strike him. The bullet entered the body of deceased about six inches below the center of the left arm-pit and about a quarter of an inch posterior to a line drawn from the arm-pit down the side of the body. The bullet was found lodged in the spinal canal.

It is unnecessary to recite the evidence in detail given by other witnesses for the defendant. There is no credible evidence in the case to support the verdict of murder in the first degree.

The rule applicable here was well stated by this court in the case of *Casey* v. *Northern Pacific Ry. Co.,* 60 Mont. 56, 198 Pac. 141, 145, where it said: "We are not unmindful of the advantageous position occupied by the jury and the lower court in having the witnesses before them, in hearing them testify, and observing their demeanor; but, though the appearance of a witness is an aid in judging his credibility, it is not an infallible one. Dissimulation is often difficult to detect, and falsehood is often clothed in the garb of truth. Whenever the surrounding circumstances make the story of a witness highly improbable or incredible, or whenever the testimony is inherently impossible, a new trial should be ordered. Physical conditions may point so unerringly to the truth as to leave no room for a contrary conclusion based on reason or common sense, and under such circumstances the physical facts are not affected by sworn testimony which in mere words conflicts with them. (*Groth* v. *Thomann,* 110 Wis. 488, 86 N. W. 178.)" To the same effect are the following cases: *Whitney* v. *Bertoglio Merc. Co.,* 65 Mont. 358, 211 Pac. 323; *First State Bank* v. *Larsen,* 65 Mont. 404, 211 Pac. 214; *Grant* v. *Chicago, Milwaukee & St. Paul Ry. Co.,* 78 Mont. 97, 252 Pac. 382; *State* v. *Wilson,* 76 Mont. 384, 247 Pac. 158.

The suggestion is made by counsel for the state that since defendant made no objection to any of the instructions

given to the jury on first degree murder, he may not now be heard to say that there is no evidence justifying the verdict. In this state by statute new trials may be granted when the verdict is contrary to the evidence. (Sec. 12048, Rev. Codes 1921.) The expression, "The verdict is contrary to the evidence," means the same thing as "insufficiency of the evidence to justify the verdict." (*Flaherty* v. *Butte Electric Ry. Co.,* 42 Mont. 89, 111 Pac. 348, 349; *State* v. *Schoenborn,* 55 Mont. 517, 179 Pac. 294; *State* v. *Hughes,* 76 Mont. 421, 246 Pac. 959.) The statute relating to new trials does not contemplate that objection must first be made to instructions before the question of insufficiency of the evidence may be relied upon as ground for a new trial.

Contention is also made that error was committed in overruling an objection to the following question propounded to the defendant on cross-examination: "Was it [referring to the roadhouse conducted by defendant] also a place where prostitution was practiced?" On direct examination defendant had testified that he was running a roadhouse. On cross-examination he said: "I said I was in the roadhouse business on July 20, 1928. By that I mean a place where intoxicating liquors were sold." At this juncture the above question was propounded to the defendant.

The occupation of a witness is a proper subject of inquiry to be developed on cross-examination, as bearing upon the credibility of the witness. (28 R. C. L. 610; 30 C. J. 171, note 54; *State* v. *Hopkins,* 147 Wash. 198, 59 A. L. R. 688, 265 Pac. 481.) It was not error to overrule the objection to the question.

The evidence being insufficient to support the verdict of murder in the first degree, the judgment is reversed and the cause remanded to the district court of Toole county with direction to grant the defendant a new trial.

Mr. Chief Justice Callaway and Associate Justices Matthews, Galen and Ford concur.

ON MOTION FOR REHEARING.

(Decided November 6, 1929.)

Opinion: PER CURIAM.

The motion for rehearing interposed by counsel for the state is in direct violation of Rule XII, Rules of this court. It does not show in the remotest degree that any question decisive. of the case submitted by counsel was overlooked by the court, or that the decision is in conflict with an express statute, or a controlling decision to which the attention of the court was not directed. It is simply a reiteration of the arguments ably and exhaustively presented orally and in counsel's briefs. It "consists chiefly of the loser's assertion of dissatisfaction over an adverse decision" (*State ex rel. Rankin* v. *Harrington,* 68 Mont. 31, 217 Pac. 681, 689), and is wholly without merit. The motion is denied.