STATE, RESPONDENT, *v.* GUNN, APPELLANT.

(No. 6,799.)

(Submitted January 13, 1931. Decided April 23, 1931.)

[300 Pac. 212.]

*Mr. W. F. O'Leary* and *Mr. D. W. Doyle,* for Appellant, submitted an original and a supplemental brief; *Mr. O'Leary* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, *Mr. T. H. MacDonald,* Assistant Attorney General, and *Mr. L. P. Donovan,* for the State, submitted an original and supplemental brief; *Mr. Donovan* argued the cause orally.

MR. JUSTICE FORD delivered the opinion of the court.

This case was here before (*State* v. *Gunn,* 85 Mont. 553, 281 Pac. 757) and we held that the evidence was insufficient to support a verdict of murder in the first degree; the judgment was reversed and the cause remanded to the district court, with direction to grant defendant a new trial.

Upon a retrial defendant was again found guilty of murder in the first degree and by judgment of the court sentenced to life imprisonment in the state prison; his motion for a new trial was denied and he appeals from the judgment and the order denying the motion. The various specifications of error present for determination the sufficiency of the evidence to support the verdict.

Defendant contends, as he did on the former appeal, that the state's testimony is so unreasonable and improbable, and so at variance with the undisputed physical facts, that it is unworthy of belief and cannot support a verdict of murder in the first degree.

On appeal in a criminal case a review by this court is limited to an examination of the record to determine whether there is any substantial evidence to justify the verdict. (*State* v. *Gustin,* 85 Mont. 581, 281 Pac. 351.)

The homicide occurred about 1 o'clock A. M. on July 21, 1928. On the evening of July 20, 1928, about 9 o'clock,

Paul and O. J. Carney and Ed. Kasten went to the roadhouse of defendant located near Sweet Grass. While there, many drinks were ordered by them and served by defendant, the Carneys drinking whisky and Kasten beer. Kasten paid for one of the drinks with a $10 bill; defendant gave him back $2.50 in change, when he should have given him $7.50. Kasten called defendant's attention to the mistake and he was given the proper change and made no further comment upon the incident. The Carneys took exception, accused defendant of attempting to short-change Kasten. There is some conflict in the testimony as to what actually took place, but it does show that the Carneys became abusive and called defendant vile names. Defendant says that he telephoned to Sweet Grass for assistance and went to his room, got his revolver and placed it behind the bar. Before assistance arrived the Carneys and Kasten had left. How long the controversy was carried on does not appear. However, another party of three arrived at the roadhouse at about 10:30 and, according to the testimony of two of the party, the Carneys were drunk but sociably inclined and indulged in no quarreling of any kind. The Carneys and Kasten left about 11 o'clock, traveling in a Dodge coupe; O. J. Carney was driving; Paul sat next to him, and Kasten on the right side of the car. At a point about one-half mile south of Sweet Grass on the main road their engine stalled; the lights were turned off and the Carneys went to sleep. Kasten remained awake. The testimony conclusively shows that at this time, approximately 11 o'clock, the Carneys were very drunk and sick, while Kasten was apparently sober. At about 1 o'clock defendant, with Bertha Erickson, left the roadhouse in a car, for the purpose, according to testimony of defendant and his witnesses, of meeting his wife, who was to arrive in Shelby from Havre at 5:30 A. M. He overtook the Carney car where it had stopped and it was at this point defendant shot Paul Carney. Defendant's car was stopped slightly back and to the left of the Carney car; the lights on defendant's car were left burning.

The testimony is in hopeless conflict as to the events leading up to the killing of Paul Carney. Kasten testified defendant stopped, got out of his car, rapped on the door of the Carney car and when it was opened, said: "'What are you doing here?' I said in answer to that, 'The boys are drunk and are asleep.' 'Oh,' he said, 'it is you sons-of-bitches, I thought I would overtake you. I am out of my joint, if you sons-of-bitches want to fight, get out and fight'"; that he struck O. J. Carney three times over the head with a pistol and then dragged him out of the car; that after O. J. was out of the car he was struck again; that he staggered backward several steps and fell in the road on his back; that he called to Paul for help; that Paul got out of the car and started the fight over again, making a couple of passes at defendant but that he, Kasten, could not see defendant; that defendant and Paul were both standing on their feet with their left hands in the air when a shot was fired and Paul sank to the ground. He then heard a woman's voice say, "Come on, Frank, you have done enough," and that Gunn started his car and ran over O. J. Carney; that O. J. crawled to the Carney car and that he, Kasten, pulled Paul's body over close to the car, and then went to Sweet Grass for help.

O. J. Carney testified that after his car stalled he went to sleep and remembered nothing until he heard defendant say, "Here you are, you sons-of-bitches, I knew I would catch up with you"; that at the time he was trying to start his car; that when he raised up he was hit on the cheek, chin and above the eye, partially dragged out of the car by defendant; that he became unconscious and when he regained consciousness he was lying in the middle of the road and a car was approaching him; that he called out, "For God's sake, don't run over me, you have done enough"; that he was run over and rendered unconscious again; that the next he remembered was the Gunn car coming from the south and he then dragged himself, or crawled, to his car and asked Kasten to get help.

Dr. Kell, who attended O. J. Carney, testified that he first saw him about 10:30 o'clock P. M. on the day of the homicide; that "he had a temperature of 103.4, also had a wiry pulse;

labored breathing; spitting some blood; eleven contused and lacerated wounds on the left limb; four on the right; five cuts on the face; a contused wound on the left shoulder, a contused left elbow; a fractured eighth rib, left rib. As to the wounds on the face, there were four in number. Two large ones, one large one above the eye, and one large one on the chin cut almost to the bone; they were on the left side, as I recall''; that he considered the wounds on the face such as might have been produced or made by being struck with a pistol. Similar testimony as to the nature of the wounds upon O. J. Carney was given by Dr. Sullivan.

There was also testimony that the wheel tracks of the Gunn car showed ''there was an abrupt break in them; there was no track there at all for a matter of eighteen inches or maybe two feet; they then resumed again and went down the road, * * * . As to the condition of the ground there, * * * the car had passed over something there; there was a pressure there in the ground, and that space where the car had passed over something was about or between eighteen inches and two feet.''

We think it clear from the evidence that the broken rib and the wounds on the body, arm and legs of O. J. Carney resulted from his having been run over by the Gunn car.

Defendant testified that he left his roadhouse about 1 o'clock A. M. to go to Shelby to meet his wife, who had written him she would arrive from Havre on the train which reached Shelby at 5:30 A. M.; that Bertha Erickson accompanied him and was going as far as Sunburst; that after turning on to the main road and about a quarter of a mile distant, he came upon a car; that he stopped his car, took his flashlight, got out and offered assistance; that until he got to the car he did not know who was in it; that as he walked up to the car he turned on the flashlight and asked if they needed help; that O. J. Carney said: ''It is you, God damn you,'' started to get out of the car and, as he did so, hollered, ''Come on Paul, we have got the son-of-a-bitch''; that O. J. Carney got out of the car; ''I backed up a couple of steps, it kind of surprised me, so as soon as he got out he started toward me, swinging his

arms and hitting me, and I started to fight back with him, and we scrapped around there quite a while, quite a little bit; he was hitting me and I was hitting him. I could not hit him, so I had the flashlight, I hit him two or three times with that flashlight, then he clinched, he jerked and grabbed me, we went to the ground. * * * He was on top * * * . I finally rolled him over. * * * I held him there and jumped in his ribs with my knees as hard as I could. * * * Just at that time Paul Carney jumped on my back and threw me backwards and jumped on top of me, and we wrestled there on the ground for a little bit, and I got up with him, and we continued to wrestle. * * * While we were wrestling in some manner he got his leg twisted around mine and threw me backwards and as he did my leg hurt, and I hit the ground, and Paul jumped on me and held me by the shoulders; he was trying to pound my head on the ground. * * * He was hurting my head. I said, 'Get off me, you hurt my leg'; he said, 'Get off of you, hell, I am going to kill you, you son-of-a-bitch; I said, 'If you don't get off of me, I am going to shoot.' He said, 'Go ahead and shoot, you haven't got guts enough, God damn you,' and drew back to hit me, and as he did I shot. * * * He rolled off of me. I tried to get up and I couldn't put any weight on my leg, so that I started for the front of the car. I got hold of a wheel, then pulled myself up, then hopped around until I got to the door and pulled myself in''; that he then drove south about a quarter of a mile, turned around and drove to Sweet Grass, stopping at the junction of the road leading to the roadhouse to let Bertha Erickson out; that at Sweet Grass he was helped out of the car and carried to a doctor's office. He testified that he had a cut under one eye, that his nose, mouth, lip and one ear were bleeding.

Defendant's version of what happened at the scene of the homicide was corroborated, in the main, by Bertha Erickson. However, on cross-examination, there was introduced in evidence a sworn statement made by her ten days after the homicide, which varies somewhat from the testimony given at the trial. Before the county attorney she testified that after leav-

ing the roadhouse "we hadn't driven far when he stopped behind another car and he got out and the next thing I heard was a lot of scuffling and swearing; then I heard a shot and he limped back to the car and said his leg was broken and then got in and drove the car, and the next thing I remember he brought me home and told me to get out and go to bed; he said he was going to see a doctor. * * * It all happened so sudden I couldn't tell what happened. I couldn't see anyway, it was dark. * * * I think one was on the ground; as far as I know, only one was lying on the ground. I couldn't swear that either of the others were lying on the ground at any time. * * * I think I saw one jump and then the other one and they knocked him [Gunn] on the ground. As I remember, Frank Gunn was lying on the ground; I couldn't distinguish who was down and who was up during the scuffle."

John Gleason, a deputy sheriff at Sweet Grass, and A. D. Owens, witnesses for defendant, testified that they went to the scene of the homicide shortly after 1:30 A. M.; that they found the body of Paul Carney lying by the car and O. J. was in the car. They further testified that the ground in front and to the left of the Carney car was torn up and pieces of money belonging to O. J. Carney were found some twelve to fifteen feet in front and to the left of the car, and his watch was lying about two feet in front of the car, and "there was evidence of a body having lain on the ground," and three blood spots. They also testified to having found a broken flashlight near the blood spots. However, the flashlight was not introduced in evidence and there is nothing to show that the flashlight belonged to defendant and there is not any evidence that the wounds upon the face of O. J. Carney could have been caused by being struck with a flashlight of the type carried by defendant. Owens testified that he assisted defendant out of the car at Sweet Grass; that "his leg was broken and there was blood streaming down his face."

Mrs. L. A. Miller, Tom Black and O. D. Clark, who visited the scene of the homicide soon after it occurred, testified that they observed the condition of the ground around and in front

of the Carney car, and that there were a great many footprints there and some money scattered in front of the car. Clark testified that he observed "evidence" that clothing had been pressed into the ground, — the outline of a body near where the money was found, and five or six blood spots.

Mrs. Gunn, wife of defendant, testified that on the evening of July 20, 1928, she was preparing to go to Sweet Grass and at about 1:30 A. M. she telephoned to that place to make sure that her husband would meet her at Shelby; she did not talk to her husband but was advised he had been hurt; that as a result of this information she fainted and did not take the train which left Havre at 2:30 but instead left at 7 o'clock A. M.; that at about 2:30 Herbert Kanuse telephoned her, and "I wanted to know what had happened." Owens testified that while he was at the roadhouse with Gleason and at about 1:30 A. M., the telephone rang; he answered and talked to Mrs. Gunn and advised her that Mr. Gunn had been hurt.

There was evidence on behalf of the state showing that the telephone exchange at Sweet Grass closed at midnight, and tending to show that a long-distance call could not have been made to the roadhouse as testified to by Mrs. Gunn and Owens.

Herbert Kanuse testified that defendant requested him to call his (defendant's) wife at Havre and ask her to come to Sweet Grass immediately or as soon as possible; that defendant did not tell him that he had an appointment to meet her at Shelby; that he called Mrs. Gunn at about 2:30 A. M. "I said, 'Frank Gunn wants you to come to Sweet Grass just as soon as you can get here,' and she says, 'It is too late now to catch this train, but I will catch the next train and I will be there at noon.' She says, 'What has happened?' and I says, 'I don't know but he drove up here with a broken leg,' and she says, 'Thank you,' and hung up the phone."

Lester Latta, a United States immigration agent, testified that a few hours after the homicide, defendant, referring to the broken leg, in effect said: "I fell down the steps in the roadhouse and broke it." This testimony was contradicted by a showing that there were no steps *in* the roadhouse; however, it is not disputed that there were temporary steps, without

risers, leading from the back door. In connection with the testimony of Latta it is significant that the officers who talked with defendant immediately after the homicide went directly to the roadhouse and examined the premises, and not to the scene of the killing.

Doctors Sullivan, Cottam and Kell testified that it was highly improbable, if not impossible, for defendant's leg to have been broken by Paul Carney in the manner testified to by defendant. Dr. Keenan took issue with them upon this point.

While defendant testified that blood was running from his mouth, nose, eyes and ear, and Owens that blood was streaming down defendant's face, Dr. Sullivan, who attended defendant immediately after the homicide, testified: "There were two or three small abrasions over the eye, if I remember; there were a couple under the eye; there were about four small abrasions under the right eye. These abrasions might have all resulted from a single blow of the fist—they could have. Aside from the injuries that I have described, there were no other injuries upon his face that I recall. I cannot recall that there was any bleeding from the nose," mouth or ears. "I cannot recall that there was any injury whatsoever on or about his head except the little bruising or abrasion to the right eye."

Dr. Cottam testified: "That discoloration of the right eye was such as a man frequently gets who receives a blow of the fist in that eye. There is not any cutting of the face whatsoever except that one little cut under the right eye. There is not a single break in the skin of the face except the little cut or breaking of the skin under the right eye; there is no breaking of the skin other than that. There was a swelling of the nose. * * * It was pretty badly swollen around the bridge of the bone. That might be due to a part of the blow to the eye. Aside from that there is not any swelling on the nose. I don't recollect any cut about his chin or mouth. I don't recollect any swelling about the chin or mouth. There were no cuts above the ears; I don't think there was any swelling about the ears. There was not a single mark upon his forehead, not above his eyes and no swelling."

Defendant testified that it was his practice to keep his roadhouse open most of the night; yet on the night in question he closed the place at 1 A. M. and left, as he says, to go to Shelby, a distance of thirty-five or forty miles, to meet a train arriving at 5:30 A. M. He offers no explanation for having done so; nor is there any explanation why Mrs. Gunn would leave Havre for Shelby at 2:30 A. M., when there was a train leaving that place at 7 A. M. The jury might well have concluded, in view of the testimony upon this point, that defendant was not on his way to meet his wife when he overtook the Carney car.

But does this evidence establish murder in the first degree? We think not. "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, or perpetrated from a deliberate and premeditated design, unlawfully and maliciously, to effect the death of any human being other than him who is killed, is murder in the first degree; and all other kinds of murder are of the second degree." (Sec. 10955, Rev. Codes 1921.)

"In order to sustain a conviction of murder in the first degree, the burden rests upon the state to establish not only the killing by the defendant but also to prove deliberation and premeditation." (*State* v. *Gunn,* supra.)

Here the only testimony of deliberation and premeditation is that of Kasten and Carney, to the effect that when defendant approached the Carney car, he said, "Oh, it's you sons-of-bitches. I thought I would overtake you. I am out of my joint, if you sons-of-bitches want to fight, get out and fight." It will be remembered that the Carneys and Kasten had left the defendant's roadhouse approximately two hours before; defendant did not know where they were going, and it is altogether improbable that when he left his place he expected to overtake them. Under all of the circumstances we are of the opinion that this evidence falls short of establishing the

deliberation and premeditation required to be established by section 10955, supra.

But it is insisted by counsel for the state that the defendant was attempting to commit robbery and the killing followed, and in consequence defendant is guilty of murder in the first degree. There is not any evidence, either direct or circumstantial, supporting such a theory.

After a most careful consideration of the evidence, together with all the facts and circumstances surrounding the homicide, we are of the opinion that a verdict of murder in the first degree cannot stand. We must, therefore, inquire whether the verdict can be treated as a valid verdict of murder in the second degree, notwithstanding it in express terms declares that defendant was guilty of murder in the first degree. This is a question of first impression in this state.

Section 12127, Revised Codes 1921, provides that this court "may reverse, affirm, or modify the judgment or order appealed from and may set aside, affirm or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial. In either case the cause must be remanded to the district court with proper instructions."

In other states where statutes authorize an appellate court to *modify* a judgment in criminal cases, the remedy in cases like this is found, not in a new trial, but by reducing the verdict to make it appropriate to the degree of the crime established by the evidence. (*Simpson* v. *State*, 56 Ark. 8, 19 S. W. 99; *State* v. *Fields*, 70 Iowa, 196, 30 N. W. 480; *State* v. *McCormick*, 27 Iowa, 402; *Johnson* v. *Commonwealth*, 24 Pa. St. 386; *People* v. *Farrell*, 146 Mich. 264, 109 N. W. 440; *Commonwealth* v. *Lawless*, 103 Mass. 425; *People* v. *O'Callaghan*, 2 Idaho, 143, 9 Pac. 414; *State* v. *Freidrich*, 4 Wash. 204, 29 Pac. 1055, 30 Pac. 328, 31 Pac. 332; *Glover* v. *State*, 7 Ga. App. 628, 67 S. E. 687; *State* v. *Sorrentino*, 31 Wyo. 129, 34 A. L. R. 1477, 224 Pac. 420.)

"Murder is the unlawful killing of a human being with malice aforethought." (Sec. 10953, Rev. Codes 1921.) There is but one crime of murder, and its division into degrees is

simply for the purpose of adjusting the punishment with reference to the presence or absence of circumstances of aggravation. (*State* v. *Hliboka*, 31 Mont. 455, 3 Ann. Cas. 934, 78 Pac. 965; *Davis* v. *Utah Territory*, 151 U. S. 262, 38 L. Ed. 153, 14 Sup. Ct. Rep. 328.) While it is true the statute requires the jury to determine the degree of murder (sec. 12022, Rev. Codes 1921), this is done for the purpose of having the jury take into consideration the distinguishing features of the two degrees, so that the punishment may be fixed with reference to the elements of the particular degree.

Here, defendant admits the killing of Paul Carney; the jury has determined that the killing was murder; the verdict of murder in the first degree necessarily implies the finding of all the essential elements of murder in the second degree, and defendant has had the benefit of a trial for that offense as fully as though the information had contained that charge.

This construction gives full force to the word "modify," as used in section 12127, supra, and gives this court the power to modify a judgment by reducing the degree of the offense to that which is sustained by the evidence. There is ample evidence to support the jury's finding of murder, and the verdict will be treated as one of murder in the second degree.

Defendant contends that the testimony of Carney and Kasten is incredible and unworthy of belief, and points out certain discrepancies in their testimony. The jurors were the exclusive judges of the credibility of the witnesses (sec. 10508, Rev. Codes 1921), and the weight to be given to their testimony, and in the absence of such inherent weakness in the testimony as would destroy it as legal evidence, this court cannot, on appeal, substitute its judgment for that of the jury. (*State* v. *Hollowell*, 79 Mont. 343, 256 Pac. 380; *State* v. *Wilson*, 76 Mont. 384, 247 Pac. 158; *State* v. *Popa*, 56 Mont. 587, 185 Pac. 1114.) Here the testimony of the witnesses is not so inherently weak as to destroy it, and we think the discrepancies appearing are only such as may easily occur in the testimony of witnesses relating what took place at a time when they were laboring under the stress of great excitement.

It is next contended that the evidence fails to show any ▇ motive on the part of defendant. The contention is without merit. It was not necessary for the state to prove motive. (*State* v. *Lucey,* 24 Mont. 295, 61 Pac. 994; *State* v. *Vanella,* 40 Mont. 326, 20 Ann. Cas. 398, 106 Pac. 364; *State* v. *Van Laningham,* 55 Mont. 17, 173 Pac. 795.)

The former decision (*State* v. *Gunn,* supra) constitutes the ▇ law of the case (*Carlson* v. *Northern Pacific Ry. Co.,* 86 Mont. 78, 281 Pac. 913.; *Altermatt* v. *Rocky Mountain Fire Ins. Co.,* ante, p. 153, 295 Pac. 327; 17 C. J. 207), but we there determined nothing more than that defendant was not guilty of murder in the first degree, and after a most careful consideration of the record we find substantial difference in the evidence. There was additional testimony on behalf of the state which tended to discredit the testimony of the defendant and his witnesses as to the events before and immediately following the homicide. Three physicians testified as to the improbability of defendant's leg having been broken in the manner claimed by him; the testimony that defendant's leg was broken by a fall and the testimony regarding the physical facts at the point of the homicide are substantially different. While there is some evidence that the ground was "kicked up" in front and to the left of the Carney car, as there was on the first trial, upon this trial there is also evidence that the ground only showed many footprints in the dust, and evidence that a body had been upon the ground. A part of the footprints may easily be accounted for by the number of persons who visited the scene soon after the homicide. The fact that the body of Paul Carney was dragged from the point where he was shot to the car, and that O. J. Carney crawled from some distance on his hands and knees to his car, would account, in a measure at least, for the condition described by the witnesses. In other words, the state's evidence is not in direct conflict with the physical facts, as was the case on the former appeal.

It is impossible to determine from the cold record what actually happened at the time of the homicide, but it is clear that the jury was of the opinion that the shot was fired in

malice with the intention of killing Paul Carney, and that defendant did not sustain his plea of self-defense. We cannot say that it was not fully justified in so doing.

The judgment will be modified by reducing the crime of which the defendant is guilty from murder in the first degree to murder in the second degree, and the cause is remanded to the district court of Pondera county, with direction to sentence the defendant to a definite number of years, taking into consideration the time already served by him, and to enter judgment accordingly.

MR. JUSTICE MATTHEWS concurs.

MR. CHIEF JUSTICE CALLAWAY: I concur. Two juries have found the defendant guilty of murder in the first degree, have repudiated utterly his plea of self-defense. Upon the first appeal we determined that the evidence did not justify a verdict of murder in the first degree, nothing more.

If the district court had withdrawn from the jury's consideration murder in the first degree as, in view of our decision upon the first appeal, it should have done, there can be no question but that the jury would have found defendant guilty of murder in the second degree.

There were obscurities in the first record and there are in this. The manner in which defendant's leg was broken, and when it was broken, is a guess at best. That there was a struggle at the scene of the killing is undoubted. It was proved by the condition of the ground in front of and at the left of the Carney car, and by the manner in which O. J. Carney was beaten by the defendant, undoubtedly by the use of a heavy gun. The record does not indicate that the ground was much roughed at the point where Paul Carney was killed. As is said in Mr. Justice Ford's opinion, the record on this appeal differs from the first as to the physical facts shown at the scene of the tragedy. It differs in other particulars also. There was additional evidence, some of which strongly tends to discredit the defendant's story, which was highly suspicious in many particulars, to say the least. Moreover, by reason

of the variableness of the human mind, the second trial of a case is certain to differ in some respects from the first. The manner in which this case was presented upon the second trial, with the addition of the new testimony, to my mind presents a stronger case than was presented upon the first trial, save only as to the degree of murder.

There is no substantial evidence showing premeditation and deliberation on the part of the defendant at any time. It is beyond belief that defendant started in pursuit of the Carneys two hours after they had left his place; but the record shows clearly that when defendant overtook them some lurid conversation took place, immediately following which, as two juries have found, the defendant was a fierce aggressor.

The jurors were entitled to weigh all the evidence; they were not bound to believe all of the testimony of any witness; they were at liberty to disbelieve all, a part, or none of the testimony of any witness, and to make up their minds on the whole case. (*State* v. *Fisher,* 23 Mont. 540, 59 Pac. 919.)

The evidence is ample to sustain a verdict of murder in the second degree. Why, then, send this case back for a third trial? There must be an end to litigation some time. No reversible error appears if we exercise the power granted us by section 12127, Revised Codes 1921. No better example of the reason for the enactment of that section is likely to appear than that which this case affords. In proper cases an exercise of the power granted will cut down expenses, relieve the courts of useless trials, and serve to promote speedy justice.

MR. JUSTICE GALEN and MR. JUSTICE ANGSTMAN, Dissenting: Conceding, as we do, that under the·statute (sec. 12127, Rev. Codes 1921) this court may, in a proper case, modify the judgment or reduce the penalty imposed to fit the crime established by the evidence (*State* v. *Sorrentino,* 31 Wyo. 129, 34 A. L. R. 1477, 224 Pac. 420; see extensive note to *State* v. *Glander,* 29 A. L. R. 313 et seq.), yet we cannot agree with the result reached on this appeal in the majority opinion, by reason of the evidence now before us presenting

similar facts, and of our decision on the former appeal (85 Mont. 553, 281 Pac. 757).

If the state's witnesses are to be believed, then there is ample evidence to sustain the verdict and judgment, it being the rule that no appreciable length of time is required to form the requisite deliberation to constitute murder in the first degree (*State* v. *Shadwell*, 22 Mont. 559, 57 .Pac. 281; 29 C. J. 1113); but in view of the physical facts appearing on the last trial, substantially the same as on the first, such evidence is unworthy of belief. In the record before us, as in that presented on the former appeal, the physical facts, to our mind, demonstrate conclusively that a struggle ensued at the place of the homicide, thus completely refuting the story of the state's witnesses as to what transpired. Additional witnesses were produced by both the prosecution and the defense, but for the most part their evidence is cumulative in character, or of a nature to discredit defendant's version of the tragedy. It should be noted that on the former appeal the cause was reversed, not because of the strength of defendant's evidence, but because of the improbability of that offered by the state.

The only eye-witness to the tragedy, other than Ed. Kasten, O. J. Carney and the defendant, was Bertha Erickson, who was at the time riding with the defendant in his automobile. She was not produced as a witness on the former trial, but gave testimony as a witness for the defendant upon the last trial which was in no manner helpful to the prosecution. Generally, her evidence corroborated the defendant's version of the homicide and is substantiated by the physical facts. Her evidence, as well as that of additional witnesses produced by the state and the defendant, is merely cumulative.

The conviction of the defendant rests almost entirely upon the testimony of O. J. Carney and Ed. Kasten, both of whom at about the time of the homicide had been drinking, and Carney was pretty well under the influence of liquor. Their stories are inconsistent and contradictory and are refuted by the physical facts. Both testified that there was no fight, but

the body of O. J. Carney was greatly bruised and his face gave unmistakable evidence of an encounter; the face of the defendant was bleeding and showed that he had been in a fight, and his leg was broken; the ground was all roughed and scuffed up, and the watch worn by O. J. Carney was found lying on the roadside with its link straightened out, indicating the force with which it was removed from his person. The money found scattered on the roadside, consisting of gold and silver, belonging to O. J. Carney, is mute evidence of a fight. At about the place on the road near where the watch and money were found there were blood spots on the ground a distance of about twelve or fifteen feet from where the Carney car stood,—all tending to corroborate the defendant's version of the homicide.

If the state's witnesses are to be believed in the story told by them, the jury was warranted in finding the defendant guilty of murder in the first degree and the verdict and judgment should not be disturbed; on the other hand, if the defendant is telling the truth, he acted in self-defense and should have been acquitted. We concede that the jury was warranted in disbelieving the story of the defendant in all its details, but that both bones in his leg were broken in a spiral fracture there can be no doubt. That it was broken in the fight is equally certain. There was no opportunity afforded to break it otherwise. Only some few minutes elapsed between the time of the shooting and the time that defendant drove into the town of Sweet Grass with the broken leg.

It is conceded by all the witnesses that the shooting of Paul Carney ended the fight. There was no fighting after that, and nothing thereafter transpired from which defendant's leg could have been broken. In consequence it follows that his leg must have been broken before the fatal shot was fired. This being so, it is improbable that defendant could have done the shooting while standing on his feet, as the witnesses for the state testified.

It is beyond belief that the defendant, after his encounter with the Carneys, returned to his roadhouse and there, deliberately or otherwise, broke his leg; moreover, M. L. Pick

who constructed the building, testified that there are no stairs in the roadhouse, so that he could not therein have fallen down any stairs to break his leg, as testified by Latta, that the defendant had told him that was the way and place in which the leg was fractured. Moreover, it is unreasonable of belief that, had he there thus severely broken his right leg, he would have thereupon, in such condition, gotten into his automobile and driven to Sweet Grass. The more natural course for him to have pursued would have been to go to bed at the roadhouse and call for help.

In the face of the physical facts shown to exist, the evidence does not, in our opinion, justify a verdict of murder in either degree. (Secs. 10953 and 10955, Rev. Codes 1921.) Malice and premeditation are completely offset by the physical facts, and in the decision of this court on the former appeal it was determined, upon substantially the same testimony, that "there is no credible evidence in the case to support the verdict of murder in the first degree." It was pertinently said by this court on that appeal: "The rule that since the jury is in a more advantageous position to pass upon the credibility of witnesses and the weight to be given to their testimony than is the supreme court and that it will not substitute its judgment for that of the jury, is not controlling where the surrounding circumstances make the story of a witness highly improbable or incredible, when the testimony is inherently impossible, or the physical facts unerringly refute his testimony." The testimony of the defendant is substantiated by the physical facts, and accordingly the verdict and judgment should be set aside. If it were not for the fact that the evidence of the state was wholly discredited, the jury would have been warranted in finding that the defendant is guilty of murder in the first degree, as contended by the state; but in view of the character of the evidence, coupled with the physical facts, the rule announced on the former appeal controls here. On the former appeal, it was only because the state's evidence was so at variance with the physical facts that this court felt impelled to hold that the verdict of murder in the first degree could not stand. There was no holding to the effect that if the state's

evidence could be believed it would not support that degree of murder. As recognized in the majority opinion, our conclusions reached in our former decision, whether right or wrong, constituted the law of the case upon like evidence. (*Carlson* v. *Northern Pacific Ry. Co.*, 86 Mont. 78, 281 Pac. 913; *Altermatt* v. *Rocky Mountain Fire Ins. Co.*, *ante*, p. 153, 295 Pac. 327.)

Bertha Erickson, one of the four eye-witnesses, did not testify upon the former trial, and her testimony given on the last trial tends only to support the position taken by the defendant, and gives additional support to the physical facts, thus further discrediting the state's witnesses. The evidence is now all before the court, and, as we think it is governed by the decision on the former appeal, the judgment should be reversed.

Rehearing denied May 21, 1931.