STATE of Utah, Plaintiff and Appellee,

v.

Robert W. DUNN, Defendant and Appellant.

No. 17571.

Supreme Court of Utah.

March 18, 1993.

1204

R. Paul Van Dam, Atty. Gen., Christine Soltis, Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

David B. Watkiss, Mary J. Woodhead, Debra J. Moore, Salt Lake City, for defendant and appellant.

ZIMMERMAN, Justice:

Robert W. Dunn appeals his 1981 jury conviction for second degree murder, Utah Code Ann. § 76–5–203 (1978 & Supp.1979) (amended 1986), and aggravated kidnapping, id. § 76–5–302 (1978) (amended 1983). This is the third time his case has come before this court. We initially affirmed his conviction in a per curiam opinion in 1982. *State v. Dunn*, 646 P.2d 709 (Utah 1982). In April of 1990, we reversed a trial court's dismissal of Dunn's petition for habeas corpus because we found sufficient grounds to permit him to claim ineffective assistance of counsel and to require a habeas corpus hearing even though he had not made that claim during the initial appeal. *Dunn v. Cook*, 791 P.2d 873, 878–79 (Utah 1990) (plurality). In June of 1990, we reinstated Dunn's right to appeal directly to this court. We now consider that appeal.

Dunn raises six claims of error: (i) insufficiency of the evidence; (ii) failure to suppress evidence resulting from an unconstitutional search; (iii) improper admission of evidence of a prior conviction; (iv) improper admission of a gruesome photograph; (v) prosecutorial misconduct during closing argument; and (vi) ineffective assistance of counsel. We reverse Dunn's conviction of second degree murder and direct entry of a judgment for reckless manslaughter. We affirm his conviction for aggravated kidnapping.

In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict. *E.g., State v. Andrews*, 843 P.2d 1027, 1030 (Utah 1992); *State v. Hamilton*, 827 P.2d 232, 233 (Utah 1992); *State v. Gardner*, 789 P.2d 273, 285 (Utah 1989), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990); *State v. McClain*, 706 P.2d 603, 605 (Utah 1985); *State v. Bolsinger*, 699 P.2d 1214, 1218 (Utah 1985) (plurality). We recite the facts according-

ly, *Hamilton*, 827 P.2d at 234, and present conflicting evidence only to the extent necessary to understand the issues raised on appeal.[1]

During the summer of 1980, Dunn met Howard Scott while hitchhiking in Santa Barbara, California. They spent a few days together, separated, and met again in Barstow, California. In Barstow, they obtained a ride from Ernest Sprinkle, who was driving his motor home to Denver, Colorado. The three traveled to Las Vegas, Nevada, where Sprinkle gave Dunn and Scott a few dollars and left them so that he could gamble. Later that night, Sprinkle and the pair resumed their journey. After a few miles, Sprinkle, who had been drinking, asked one of the others to drive. Dunn drove from that point on.

In Mesquite, Nevada, they stopped to buy gas and continue gambling. Again, Sprinkle gave Dunn and Scott money. Scott began gambling with Sprinkle, and they continued to gamble until dawn. At one point during the night, Dunn became upset with Sprinkle and Scott because they were losing money and because Sprinkle was becoming increasingly drunk. The trio left Mesquite around 6 a.m., with Dunn driving.

After crossing the Utah border, Sprinkle lay down on the floor in the rear of the motor home. While Dunn drove, Scott went to the back of the motor home and hit Sprinkle on the head. One or both of the men tied Sprinkle's arms and hands together and wrapped a towel around his mouth. Scott testified at trial that he hit Sprinkle because Dunn told him that Sprinkle "had to be killed ... [b]ecause he was getting on [Dunn's] nerves and aggravating and trying to tell him how to drive." Scott also testified that he and Dunn had decided to rob Sprinkle and that both of them tied Sprinkle up. Dunn, on the other hand,

testified that he did not plan with Scott to rob Sprinkle and that Scott hit and bound Sprinkle on his own initiative. However, a jail inmate named Thomas Gleffe testified that while he and Dunn were incarcerated together, Dunn said that he and Scott were "partners" and that they had intended to tie up Sprinkle, rob him, and leave him somewhere.

As the journey continued, Dunn and Scott made two more stops. The first was in a small unidentified town where they purchased gas. The second was in Richfield, Utah, at a service station. There, both men left the motor home to buy a fuse for its citizen-band radio. Scott paid for the fuse, while Dunn inspected it. Dunn went back inside the motor home. Before Scott reentered the motor home, he waved over a hitchhiker standing about five hundred feet away. When the hitchhiker reached the motor home, Scott told him to wait a minute and went inside the motor home.

At that point, the hitchhiker heard and saw Sprinkle in the motor home pounding on the window and screaming for help. The service station attendant also heard Sprinkle pounding on the window. Scott rushed to the back of the motor home, while Dunn pulled the vehicle out of the station in front of an oncoming semi-truck. As the motor home left the station, the service station attendant saw Sprinkle still pounding at the window. The semi-truck driver also saw Sprinkle motioning for help as he came up behind the motor home. Someone then pulled down the back window shade.

Minutes later, Sprinkle locked himself in the motor home's bathroom. Scott forced open the door and fired two fatal shots at Sprinkle from a .25–caliber hand gun. Scott testified that Dunn had given him the gun and that he shot Sprinkle because

---

**1.** The Attorney General's office destroyed the original indexed and paginated record as a matter of course due to the passage of time after the initial appeal. A record was reconstructed for the purposes of this appeal. The reconstructed record contains only the trial transcript, jury instructions, defendant's proposed instructions, and judgment of conviction. No other documents were available for review.

Dunn again told him that Sprinkle had to be killed. Dunn, however, testified that the gun was Scott's, that Scott was acting on his own, and that Dunn was unable to do anything because he feared for his own safety. Gleffe, the jail inmate who testified about his conversation with Dunn, also testified that Scott had told him the gun was Scott's.

Alerted by a call from the service station attendant in Richfield, a Utah Highway Patrolman stopped the motor home near Salina, Utah, finding Dunn in the driver's seat and Scott in the back. The officer testified that Dunn looked "calm and collected" when asked for his identification. When the officer asked Dunn for the vehicle's registration, Dunn replied that the motor home was a "drive-out car" from California. Scott added that they were taking it to Denver. When the officer requested the authorizing papers, the pair shuffled through the contents of a console between the seats but failed to produce them.

The officer ordered Dunn and Scott out of the motor home, entered the vehicle, and found Sprinkle's body in the bathroom. When the officer stepped out, he asked Dunn about the body. Dunn responded, "I want a lawyer. All I was told to do was drive." Dunn and Scott were arrested. During a later search, the police found the gun used in the killing under a mattress in the motor home and unspent .25–caliber cartridges in Dunn's duffle bag. Sprinkle's wallet was never located. When they were arrested, Scott had $30 and Dunn had less than a dollar.

Scott and Dunn were charged with first degree murder and aggravated kidnapping, both capital offenses at the time, and separate trials were held in the Sixth District Court. Scott was tried first. The jury convicted him of aggravated kidnapping but was unable to arrive at a verdict on the first degree murder charge. In return for his agreement to testify against Dunn, Scott pleaded guilty to a reduced charge of second degree murder.

At Dunn's trial, the prosecution's primary theory was that Dunn acted as a principal in Sprinkle's kidnapping and as an accomplice in Sprinkle's killing. Dunn, represented by a court-appointed attorney, asserted the affirmative defense of compulsion. *See* Utah Code Ann. § 76–2–302. The court instructed the jury that, among other things, it could convict Dunn of homicide under either a principal or accomplice theory. The jury returned a verdict of guilty of second degree murder and aggravated kidnapping, for which Dunn received concurrent sentences of five years to life and life imprisonment. After the conviction, his trial counsel filed an appeal brief on Dunn's behalf and then requested permission to withdraw from the case. This court granted the request and affirmed the conviction. *State v. Dunn,* 646 P.2d 709 (Utah 1982) (per curiam).

Dunn subsequently obtained new counsel and petitioned the Third District Court for a writ of habeas corpus, which the court denied. We reversed that decision in *Dunn v. Cook,* 791 P.2d 873 (Utah 1990). Four members of this court found that Dunn had demonstrated a sufficient possibility that his trial counsel was ineffective in representing him during his initial appeal to permit him to raise an ineffectiveness claim for the first time in a habeas corpus proceeding. *Id.* at 878 (Stewart, J., joined by Durham, J.); *id.* at 879 (Zimmerman, J., concurring in the result, joined by Hall, C.J.). Although we remanded the case for a hearing, we later reinstated Dunn's direct appeal to this court in response to his motion, which the State did not oppose. We now consider Dunn's appeal as if it were his first appeal to this court.

Before we reach the claims of error, we address a crucial threshold issue. In his opening brief, Dunn challenged his convictions for second degree murder and aggravated assault on six grounds, arguing that each ground warranted reversal of each of the convictions. The State responded that none of these grounds justified reversal of Dunn's aggravated kidnapping conviction. However, with respect to the second degree murder conviction, the State conceded that the trial court had committed plain

error in instructing the jury as to the elements of second degree murder and that therefore the second degree murder conviction should be reversed. The State suggested that in place of the flawed second degree murder conviction, we should enter judgment for reckless manslaughter, as we did in *State v. Bindrup*, 655 P.2d 674, 676 (Utah 1982). Dunn's reply brief redirected his six arguments against the State's suggestion that we enter a judgment for reckless manslaughter.

If we agree with the State that Dunn's conviction for second degree murder should be set aside, analyzing his six challenges to that conviction would serve no purpose. Therefore, we first decide whether the trial court committed plain error in instructing the jury as to the elements of second degree murder. Because we conclude that it did, we next address Dunn's arguments against entering judgment for reckless manslaughter. The balance of the opinion addresses Dunn's six claims of error as they relate to a judgment of reckless manslaughter and his conviction for aggravated kidnapping.

To determine whether the trial court committed plain error in instructing the jury on the elements of second degree murder, we compare the instruction given with the statutory elements of the offense. The jury was instructed that it could find Dunn guilty of second degree murder if the prosecution established the following:

1) That Robert W. Dunn intentionally or knowingly caused the death of Ernest Sprinkle; or

2) That Robert W. Dunn acted under circumstances evidencing a depraved indifference to human life, *recklessly engaged* in conduct which created a grave risk to another and thereby caused the death of Ernest Sprinkle.

(Emphasis added.) At the time of trial, the relevant language of the second degree murder statute on which this instruction was based read:

> Criminal homicide constitutes murder in the second degree if the actor:
>
> (a) intentionally or knowingly causes the death of another; [or]
>
> ...;
>
> (c) acting under circumstances evidencing a depraved indifference to human life, he *engaged* in conduct which creates a grave risk of death to another and thereby causes the death of another....

Utah Code Ann. § 76-5-203(1) (1978 & Supp.1979) (amended 1986) (emphasis added).

The State points out that the above-quoted language of the second degree murder statute does not include recklessness as a mental state and that the instruction given, which mentions recklessness, could be easily confused with the offense described in Utah's manslaughter statute. § 76-5-205.[2] Consequently, the State concedes, the use of a second degree murder instruction including the word "recklessly" amounts to plain error. The State suggests that we review the instruction under the plain error standard because Dunn's trial counsel objected to the instruction "only on general evidentiary grounds," thus failing to object adequately. *See State v. Emmett*, 839 P.2d 781, 785 (Utah 1992); *State v. Eldredge*, 773 P.2d 29, 34-35 (Utah), *cert. denied*, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989).

█ In general, to establish the existence of plain error and to obtain appellate relief from an alleged error that was not properly objected to, the appellant must show the following: (i) An error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our

---

**2.** Section 76-5-205 states, "Criminal homicide constitutes manslaughter if the actor: (a) recklessly causes the death of another...."

confidence in the verdict is undermined.[3] *See State v. Verde,* 770 P.2d 116, 122 (Utah 1989); *State v. Bell,* 770 P.2d 100, 105–06 (Utah 1988); *State v. Knight,* 734 P.2d 913, 919–20 (Utah 1987); *State v. Fontana,* 680 P.2d 1042, 1048 (Utah 1984); *see also Eldredge,* 773 P.2d at 35–36; *cf.* Utah R.Evid. 103(d); Utah R.Crim.P. 19(c). If any one of these requirements is not met, plain error is not established. *Cf. State v. Hamilton,* 827 P.2d 232, 240 (Utah 1992); *Verde,* 770 P.2d at 123.

■ We agree with the State that the trial court committed plain error. First, the instruction was erroneous. *See Fontana,* 680 P.2d at 1046–47; *State v. Bindrup,* 655 P.2d 674, 676 (Utah 1982). Under the instruction given, the jury could have mistakenly believed that reckless conduct alone is sufficient to prove murder in the second degree. Second, because the second degree murder statute does not include the word "recklessness" in describing the actor's mental state and the manslaughter statute does, we think the error should have been obvious to the trial judge. Third, we find that the error was prejudicial because we cannot be sure that the jury did not convict Dunn on the basis of a reckless mental state alone. *Cf. Bindrup,* 655 P.2d at 676. Consequently, we must reverse his conviction for second degree murder.

Having held that Dunn's conviction for second degree murder cannot stand, we consider the State's suggestion that we direct the trial court to enter judgment for reckless manslaughter rather than remanding the case for a new trial on the second degree murder charge. For this proposition, the State relies on *Bindrup,* 655 P.2d 674, in which we directed entry of judgment under similar facts by applying section 76–1–402(5) of the Code.

■ Section 76–1–402(5), enacted in 1973, states in relevant part:

> If ... an appellate court on appeal ... shall determine that there is insufficient evidence to support a conviction for the offense charged but that there is sufficient evidence to support a conviction for an included offense and the trier of fact necessarily found every fact required for conviction of that included offense, the verdict or judgment of conviction may be set aside or reversed and a judgment of conviction entered for the included offense, without necessity of a new trial, if such relief is sought by the defendant.

Utah Code Ann. § 76–1–402(5) (codifying 1973 Utah Laws ch. 196, § 76–1–402). In this case, we have not reversed Dunn's second degree murder conviction for insufficiency of evidence and Dunn has not sought entry of judgment—both of which section 76–1–402(5), on its face, requires. While we may be able to force the facts here to fit the statute, as we have done on other occasions, *see, e.g., State v. Johnson,* 821 P.2d 1150, 1159–60 (Utah 1991); *State v. Tuttle,* 780 P.2d 1203, 1219 (Utah 1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990); *Bolsinger,* 699 P.2d at 1221; *Bindrup,* 655 P.2d at 676, there is no reason to do so. Instead, we rely on our general power to modify criminal judgments on appeal to direct entry of judgment for reckless manslaughter against Dunn.

Numerous state and federal courts have concluded that when a defendant is convicted of an offense but an error occurred at trial, a court has the power to enter judgment for a lesser included offense rather than ordering a retrial if (i) the trier of fact necessarily found facts sufficient to constitute the lesser offense, and (ii) the error did not affect these findings. *See, e.g., State*

---

3. We note that a claim of error also may be revived despite the lack of a contemporaneous objection if "exceptional circumstances" exist. *See Jolivet v. Cook,* 784 P.2d 1148, 1151 (Utah 1989), *cert. denied,* 493 U.S. 1033, 110 S.Ct. 751, 107 L.Ed.2d 767 (1990); *State v. Gibbons,* 740 P.2d 1309, 1311 (Utah 1987); *see also State v.*

*Archambeau,* 820 P.2d 920, 922 (Utah Ct.App. 1991). However, because the exceptional circumstances exception is ill-defined, *see Archambeau,* 820 P.2d at 926, and applies primarily to rare procedural anomalies, we proceed under the better-established plain error exception. *See generally id.* at 922–26.

*v. Byrd*, 385 So.2d 248, 253 (La.1980) (Watson, J., dissenting) (listing twenty states that allow this result).[4] We conclude that we have the same power.

The power to enter judgment for a lesser included offense derives from a number of sources. Many courts find this power in statutory language giving an appellate court general power to "modify" a judgment on appeal. *See, e.g., Austin v. United States*, 382 F.2d 129, 140–43 (D.C.Cir. 1967), *overruled on other grounds by United States v. Sherod*, 960 F.2d 1075, 1076 (D.C.Cir.1992); *People v. Alexander*, 140 Cal.App.3d 647, 189 Cal.Rptr. 906, 918 (1983); *Ritchie v. State*, 243 Ind. 614, 189 N.E.2d 575, 576–79 (1963); *State v. Gunn*, 89 Mont. 453, 300 P. 212, 217 (1931); *State v. Sorrentino*, 31 Wyo. 129, 224 P. 420, 426–27 (1924). *See generally Austin*, 382 F.2d at 140 n. 24 (collecting cases).

Utah no longer has such a statute, but the substance of the power to "modify" judgments continues in our rules. From territorial days until 1980, Utah statutes expressly authorized this court to "reverse, affirm or modify the judgment or order appealed from, and . . . set aside, affirm or modify any or all the proceedings, subsequent to or dependent upon such judgment or order, and . . ., if proper, order a new trial." 1888 Comp.L.Utah § 5154 (codified at Utah Code Ann. § 77–42–3 (1978)) (repealed 1980). From 1973 through 1980, this provision coexisted with section 76–1–

402(5), implicitly relied on by the State to seek entry of judgment in the instant case. In 1980, the legislature repealed title 77 of the Utah Code and replaced it with an entirely new code of criminal procedure. *See* 1980 Utah Laws chs. 14, 15. The new code included section 77–35–28, designated by the legislature as Rule of Criminal Procedure 28. This provided in part:

(a) If a judgment of conviction is reversed, a new trial shall be held *unless otherwise specified by the appellate court*. . . .

(b) Upon affirmance by the appellate court, the judgment or order affirmed *or modified* shall be executed.

Utah Code Ann. § 77–35–28 (1982) (emphasis added) (repealed 1990) (now Utah R.Crim.P. 28).

In January of 1989, acting pursuant to our express authority over the rules of practice and procedure granted us by the 1984 amendment of article VIII, section 4 of the Utah Constitution, we adopted the text of section 77–35–28 as rule 28 of this court's Utah Rules of Criminal Procedure.[5] The substance of rule 28 of the Utah Rules of Criminal Procedure is reflected in rule 30(b) of the Utah Rules of Appellate Procedure, which were adopted in 1984.[6] Rule 30(b) provides: "If a judgment of conviction is reversed, a new trial shall be held unless otherwise specified by the court. If a judgment of conviction or other order is

---

**4.** In addition to the twenty states listed in Justice Watson's dissent, courts in Alabama, Alaska, Connecticut, Hawaii, Iowa, Kansas, Rhode Island, and Washington have exercised the power to modify a criminal judgment on appeal by entering judgment for conviction of a lesser included offense. *See, e.g., Ex Parte Edwards*, 452 So.2d 508, 509–10 (Ala.1984); *Hatfield v. State*, 663 P.2d 987, 991 (Alaska Ct.App.1983); *State v. Grant*, 177 Conn. 140, 411 A.2d 917, 920–21 (1979); *State v. Arlt*, 833 P.2d 902, 910 (Haw.Ct.App.1992); *State v. Lampman*, 342 N.W.2d 77, 81 (Iowa Ct.App.1983); *State v. Moss*, 221 Kan. 47, 557 P.2d 1292, 1295 (1976); *State v. Eiseman*, 461 A.2d 369, 384 (R.I.1983); *State v. Liles*, 11 Wash.App. 166, 521 P.2d 973, 977 (1974). Federal courts also have recognized this power. *See, e.g., Austin v. United States*, 382 F.2d 129, 140–43 (D.C.Cir.1967), *overruled on other grounds by United States v. Sherod*, 960

F.2d 1075, 1076 (D.C.Cir.1992); *Dickenson v. Israel*, 482 F.Supp. 1223, 1226 (E.D.Wis.1980), *aff'd & opinion adopted*, 644 F.2d 308 (7th Cir. 1981).

**5.** Most of the Utah Rules of Criminal Procedure were originally codified in chapter 35 of title 77 of the Utah Code. After we adopted these statutory rules as court rules, the legislature repealed the superfluous provisions effective July 1, 1990. 1989 Utah Laws ch. 187, § 15.

**6.** The Utah Rules of Appellate Procedure, which became effective in 1990, consolidated the Rules of the Utah Supreme Court and the Rules of the Utah Court of Appeals, both of which were adopted in 1984 and became effective in 1985. Rule 30(b) has not changed since 1985.

affirmed *or modified,* the judgment or order affirmed *or modified* shall be executed." Utah R.App.P. 30(b) (emphasis added). While Utah Rule of Criminal Procedure 28 and Utah Rule of Appellate Procedure 30(b) do not contain a provision expressly authorizing an appellate court to modify a judgment on appeal, they, like section 77–42–3 before them, acknowledge the *continuation of this longstanding power.*

Thus, like the federal courts and courts in many other states, we have the authority to modify criminal judgments on appeal. And like other courts having this power, we may enter judgment on a lesser included offense when an error has tainted the conviction for the greater offense.[7]

■ Returning to the merits, we find that this is an appropriate case in which to direct entry of judgment. First, the jury necessarily found every fact required for reckless manslaughter beyond a reasonable doubt in returning a guilty verdict under the second degree murder instruction it was given. We reach this conclusion by comparing the elements required for reckless manslaughter and the second degree murder instruction.

The elements for reckless manslaughter are derived from two statutes. Section 76–5–205(1) states, "Criminal homicide constitutes manslaughter if the actor: (a) recklessly causes the death of another...." Utah Code Ann. § 76–5–205(1)(a). "Recklessly," in turn, is defined in section 76–2–103 as follows:

A person engages in conduct:

....

(3) Recklessly, or maliciously, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 76–2–103.

The instruction given the jury for second degree murder allowed it to return a verdict of guilty only if the prosecution proved either of the following:

1) That Robert W. Dunn intentionally or knowingly caused the death of Ernest Sprinkle; or

2) That Robert W. Dunn acted under circumstances evidencing a depraved indifference to human life, recklessly en-

---

7. Even in the absence of statutory authority to modify judgments, many courts have found an inherent or common law power to enter judgment for a lesser included offense. The Delaware Supreme Court has found the power to modify a conviction inherent in state constitutional language authorizing a court to " 'receive appeals ... in criminal causes ... and to determine finally all matters of appeal on the judgments and proceedings' of the Superior Court." *Porter v. State,* 243 A.2d 699, 702 (Del.1968) (quoting Del. Const. art. IV, § 11(1)(b)). Similarly, we are granted "power to issue all writs and orders necessary for the exercise of the Supreme Court's jurisdiction *or the complete determination of any cause."* Utah Const. art. VIII, § 3 (emphasis added).

At least two state supreme courts have stated that the power to modify the judgment of a lower court· is inherent in the function of an appellate court, though these courts arguably were authorized to modify judgments through statutes or constitutional provisions. *See State v. Braley,* 224 Or. 1, 355 P.2d 467, 473 (1960); *Commonwealth v. Sterling,* 314 Pa. 76, 170 A. 258, 259 (1934). Some courts have inferred a common law power from decisions of federal and other state courts. *See, e.g., State v. Grant,* 177 Conn. 140, 411 A.2d 917, 920–21 (1979); *State v. Byrd,* 385 So.2d 248, 252–53 (La.1980); *State v. Eiseman,* 461 A.2d 369, 384 (R.I.1983). Others have simply entered judgment for lesser included offenses without discussing the authority for such action. *See, e.g., Wills v. State,* 193 Ark. 182, 98 S.W.2d 72, 74 (1936); *Jones v. State,* 555 P.2d 63, 69 (Okla.Crim.App.1976); *Forsha v. State,* 183 Tenn. 604, 194 S.W.2d 463, 467 (1946). Similarly, we have entered judgment on lesser included offenses without citing our authority to do so on at least three occasions. *State v. Bruce,* 779 P.2d 646, 657 (Utah 1989); *State v. Suniville,* 741 P.2d 961, 965 (Utah 1987); *State v. Lucero,* 28 Utah 2d 61, 498 P.2d 350, 351 (1972).

gaged in conduct which created a grave risk of death to another and thereby caused the death of Ernest Sprinkle.

The jury was also given an instruction defining recklessness in terms identical to those included in section 76-2-103.

The statutory elements for reckless manslaughter are incorporated in the second degree murder instruction given to the jury. The jurors found Dunn guilty under either the first branch of the instruction, that he intentionally or knowingly caused ·Sprinkle's death, or the second branch of the instruction, that he recklessly caused Sprinkle's death. A finding that Dunn intentionally or knowingly caused Sprinkle's death necessarily includes a finding that he did so recklessly. *See State v. Crick,* 675 P.2d 527, 529 (Utah 1983); *State v. Day,* 815 P.2d 1345, 1348 (Utah Ct.App.1991); *State v. Pendergrass,* 803 P.2d 1261, 1264 (Utah Ct.App.1990); *see also* Utah Code Ann. § 76-2-104. Therefore, regardless of whether the jury found that Dunn caused Sprinkle's death intentionally, knowingly, or recklessly, it necessarily found every fact required to convict Dunn of reckless manslaughter.

Second, neither Dunn nor the State is unfairly prejudiced by our decision to reduce his conviction to manslaughter. The jury convicted Dunn of homicide. The error in the instruction may call into question the second degree murder verdict; however, there is no question that the jury found beyond a reasonable doubt all the facts necessary to convict Dunn of manslaughter.[8] At trial, Dunn requested and received an instruction on manslaughter. Thus, he has indicated a willingness to consider manslaughter as an alternative to second degree murder. *Cf. State v. Myers,* 158 Wis.2d 356, 461 N.W.2d 777, 783 (1990). And we see no merit to the issues raised on Dunn's behalf by the dissent.

Furthermore, the State essentially has decided to forego retrying Dunn for second degree murder in asking us to direct entry of judgment for reckless manslaughter against him. This is not surprising. Because his trial was held more than ten years ago, the obstacles to retrial on the second degree murder charge likely would be great. In sum, neither Dunn nor the State will be unfairly prejudiced if we modify Dunn's conviction for Sprinkle's homicide. Therefore, we direct the trial court to enter judgment against Dunn for reckless manslaughter.

We now consider Dunn's other claims of error. Anticipating an entry of a reckless manslaughter judgment, Dunn has redirected his claims of error to challenge that judgment as well as his conviction for aggravated kidnapping. His first claim is a general challenge to the sufficiency of evidence.

In considering an insufficiency-of-evidence claim, we review the evidence and all reasonable inferences that may be drawn from it in a light most favorable to the verdict. We reverse a jury verdict only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted. *State v. Johnson,* 821 P.2d 1150, 1156 (Utah 1991); *State v. James,* 819 P.2d 781, 784-85 (Utah 1991); *State v. Eldredge,* 773 P.2d 29, 38 (Utah), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989); *State v. Verde,* 770 P.2d 116, 124 (Utah 1989); *State v. Booker,* 709 P.2d 342, 345 (Utah 1985). The trial court's denial of Dunn's motion to dismiss on the basis of insufficiency of the evidence after the close of the prosecution's case lends further weight to the jury's verdict. *Cf. Johnson,* 821 P.2d at 1156.

---

**8.** As noted by the Louisiana Supreme Court: This procedure does not constitute interference with the function of the trial judge or jury in a criminal trial, but rather constitutes action in accordance with the findings of the trier of fact. Moreover, this procedure does not deprive the defendant of his right to have a trial judge or jury decide on the proof of the elements of the lesser and included offense, *but rather recognizes that the trier of fact has already made that decision.* *Byrd,* 385 So.2d at 252 (emphasis added).

We first consider the sufficiency of evidence supporting Dunn's aggravated kidnapping conviction. To convict Dunn of aggravated kidnapping, the prosecution had to prove beyond a reasonable doubt each statutory element of the crime. *See id.* Because Dunn raised the affirmative defense of compulsion, the prosecution also had to prove beyond a reasonable doubt the absence of compulsion. *State v. Hill,* 727 P.2d 221, 222 (Utah 1986); *State v. Starks,* 627 P.2d 88, 92 (Utah 1981); *State v. Torres,* 619 P.2d 694, 695 (Utah 1980).

We begin by considering the elements of aggravated kidnapping. The aggravated kidnapping statute in effect at the time of Sprinkle's abduction provided in part:

(1) A person commits aggravated kidnapping when he [or she] intentionally or knowingly by force, threat, or deceit, detains or restrains another against his [or her] will with intent:

. . .;

(b) To facilitate the commission, attempted commission, or flight after commission or attempted commission of a felony[.]

Utah Code Ann. § 76–5–302 (1978) (amended 1983).

Dunn's attack on the evidence supporting his conviction for aggravated kidnapping is essentially twofold. First, he claims that the testimony of Scott and Gleffe, standing apart from any other evidence, is "sufficiently inconclusive or inherently improbable" as to be legally insufficient to support an aggravated kidnapping conviction. Second, Dunn claims that the remaining evidence is consistent with his compulsion defense and therefore is also legally insufficient.

In attacking Scott's and Gleffe's testimony, Dunn hopes to undermine evidence that, if believed, obviously would be sufficient to establish that Dunn and Scott intended to detain or restrain Sprinkle by force to facilitate robbing him, which is a second degree felony, *id.* § 76–6–301(2), and that they followed through with their plan. For example, Scott testified that he and Dunn originally intended to rob Sprinkle and that he and Dunn together bound Sprinkle. Gleffe testified that after Dunn's arrest, Dunn told Gleffe that he and Scott intended to rob Sprinkle, tie him up, and leave him somewhere.

Dunn claims that reasonable minds could not rely on Scott's and Gleffe's testimony because their testimony is patently incredible and thus "inherently improbable." Dunn points to the fact that Scott's pretrial statements and testimony were highly inconsistent and that Scott admitted to being diagnosed as a pathological liar. Dunn attempts to discredit Gleffe by pointing out that at the time he testified, Gleffe himself was serving time for a felony conviction and that he and Scott had been jail mates.

█ As we have often said, credibility is an issue for the trier of fact, in this case the jury. *See, e.g., James,* 819 P.2d at 784; *State v. Hopkins,* 782 P.2d 475, 477 (Utah 1989); *Booker,* 709 P.2d at 345; *State v. Wilson,* 565 P.2d 66, 68 (Utah 1977). The jury necessarily accepts the testimony of certain witnesses and discounts conflicting testimony. *Fillmore Prods. v. Western States Paving, Inc.,* 592 P.2d 581, 582 (Utah 1979); *Turner v. General Adjustment Bureau, Inc.,* 832 P.2d 62, 67 (Utah Ct.App.1992). Moreover, as a general rule, in reviewing a jury verdict we assume that the jury believed the evidence supporting the verdict. *State v. Stewart,* 729 P.2d 610, 611 (Utah 1986), *habeas corpus granted on other grounds, Stewart v. State by and through DeLand,* 830 P.2d 306 (Utah Ct.App.1992); *State v. Singer,* 815 P.2d 1303, 1306 (Utah Ct.App.1991); *see Booker,* 709 P.2d at 345. Accordingly, we must assume that the jury believed Scott's and Gleffe's testimony. As Dunn's argument implicitly recognizes, that testimony is legally sufficient, standing alone, to support a conviction for aggravated kidnapping and to disprove Dunn's claim of compulsion.

Because we have found that Scott's and Gleffe's testimony, standing alone, is suffi-

cient as a matter of law to support Dunn's aggravated kidnapping conviction, we have no need to consider Dunn's argument that the remaining evidence is legally insufficient. Therefore, we reject Dunn's claim that the evidence supporting his conviction for aggravated kidnapping is legally insufficient.

We now consider Dunn's challenge to the sufficiency of the evidence supporting a judgment for reckless manslaughter. Dunn essentially makes two arguments. First, he argues that the evidence is legally insufficient to support the requisite mental state, especially in light of his compulsion defense. Second, he argues that the evidence does not show the requisite causal link between Dunn's actions and Sprinkle's death.

 We first consider the evidence supporting the mental state required for reckless manslaughter and disproving Dunn's compulsion defense. The prosecution must have adduced legally sufficient evidence showing that Dunn was aware of but disregarded a substantial and unjustified risk that Sprinkle's death would occur, Utah Code Ann. § 76-2-103(3), and that he did not act under compulsion. Dunn's attack on the evidence supporting a finding of a reckless mental state is essentially the same as his attack on the evidence supporting his conviction for reckless manslaughter. He claims that Scott's and Gleffe's testimony is "sufficiently inconclusive or inherently improbable," and therefore legally insufficient, because Scott demonstrated that he was a pathological liar and because Gleffe was a felon and Scott's jail mate. Dunn further asserts that any other evidence is consistent with his compulsion defense and thus cannot support a finding of a reckless state of mind.

In challenging Scott's and Gleffe's testimony, Dunn again seeks to invalidate evidence that, standing alone, is legally sufficient to establish that he was acting reck-

lessly and not under compulsion. For example, as discussed earlier, Scott's and Gleffe's testimony establishes that Dunn and Scott planned and carried out a violent crime against Sprinkle, during which Sprinkle died. Perhaps most damaging to Dunn, Scott testified that after Sprinkle worked free of his bonds and Scott went to the back of the motor home to subdue him, Dunn told him to kill Sprinkle. As a matter of law, this testimony, if believed, is sufficient to prove Dunn's reckless state of mind and disprove his claim of compulsion.

For the same reasons discussed in our analysis of the evidence supporting Dunn's conviction for aggravated kidnapping, Dunn's challenge to Scott's and Gleffe's testimony must fail. Under the standards articulated in that discussion, we have no choice but to assume that the jury believed Scott and Gleffe. Consequently, we conclude that their testimony was legally sufficient to establish that Dunn had a reckless state of mind and have no need to consider whether the remaining evidence was consistent with his compulsion defense.

We note that much of the remaining uncontested evidence corroborates Scott's and Gleffe's testimony, at least to the extent it establishes Scott's and Dunn's intent to rob and bind Sprinkle and Dunn's active participation during the shooting. Sprinkle was tied up long before he was shot, and his wallet was never found. When Sprinkle worked free and started yelling for help, Dunn quickly pulled the motor home out of the station. Dunn knew Scott had access to the gun before Scott went back to subdue Sprinkle, and the police later found bullets for that gun in Dunn's duffle bag.[9] Moreover, while Dunn was driving, he heard Scott trying to force open the bathroom door to get to Sprinkle. In sum, we think that there is ample evidence to support a finding that Dunn was aware of but disregarded a substantial risk that Sprinkle's death would occur.

9. Dunn also challenges the trial court's admission of the bullets as fruit of an unconstitutional search. We conclude later in this opinion that the bullets were properly admitted.

■ Dunn's second attack on the sufficiency of the evidence supporting a judgment for reckless manslaughter is that the evidence does not support a finding that he caused Sprinkle's death. The Code does not indicate the requirements for causation under the reckless manslaughter statute. We conclude, therefore, that the legislature must have intended causation to be determined under common law.[10] *See* Utah Code Ann. § 68–3–1.

■ Although the common law requirement for the causation element of reckless manslaughter is not well developed in Utah, our case law does indicate that the linchpin of causation is whether the superseding party's acts were reasonably foreseeable. For example, in *State v. Hallett*, 619 P.2d 335 (Utah 1980), the defendant vandalized a stop sign at an intersection. The decedent, not seeing the stop sign, drove through the intersection without stopping, collided with another vehicle, and was killed. The defendant was convicted of negligent manslaughter and appealed on several grounds, including lack of causation. In addressing his causation claim, we wrote:

> [W]here a party by his [or her] wrongful conduct creates a condition of peril, his [or her] action can properly be found to be the proximate cause of a resulting injury, even though later events which combined to cause the injury may also be classified as negligent, so long as the later act is something which can reason-

ably be expected to follow in the natural sequence of events. Moreover, when reasonable minds might differ as to whether it was the creation of the dangerous condition … which was the proximate cause, or whether it was some subsequent act …, the question is for the trier of fact to determine.

*Id.* at 339. We then held that regardless of whether the defendant acted negligently or with "malicious intent," the evidence was sufficient for the jury to find causation. *Id.* At least two of our other cases have ratified an analysis similar to that used in *Hallett. See State v. Lawson*, 688 P.2d 479, 482 & n. 3 (Utah 1984); *State v. Hamblin*, 676 P.2d 376, 379 (Utah 1983).

These cases track the general common law, which has been characterized as follows:

> An intervening, independent agency will not exonerate [the] accused for criminal liability from a victim's death unless the death is solely attributable to the secondary agency, and not at all induced by the primary one. To qualify as an intervening cause an event must be unforeseeable and one in which [the] accused does not participate; an intervening cause must be so extraordinary that it is unfair to hold [the] accused responsible for the death.

40 C.J.S. *Homicide* § 6, at 363 (1991) (footnotes omitted); *accord* 1 Charles E. Torcia, *Wharton's Criminal Law* § 26 (1978); Wayne R. LaFave & Austin W. Scott, Jr.,

---

**10.** Much of the Utah Criminal Code is based upon the Model Penal Code ("MPC"), which does contain a causation provision. Section 2.03 of the MPC states:

(1) Conduct is the cause of a result when:

(a) it is an antecedent but for which the result in question would not have occurred; and

(b) the relationship between the conduct and result satisfies any additional causal requirements imposed by the Code....

....

(3) When recklessly … causing a particular result is an element of an offense, the element is not established if the actual result is not within the risk of which the actor is aware … unless

…;

(b) the actual result involves the same kind of injury or harm as the probable result and is not too remote or accidental in its occurrence to have a [just] bearing on the actor's liability or on the gravity of his offense.

1 *Model Penal Code and Commentaries* § 2.03, at 253–54 (Amer.L.Inst.1985) (brackets in original). The MPC commentary to this provision indicates that "but for" causation is to be construed loosely (i.e., actual causation can be fairly attenuated). *Id.* at 257–60. We note that under the MPC formulation of causation, the evidence before us is sufficient to support a finding of causation against Dunn.

*Criminal Law* § 35 (1972); Melvin F. Wingersky, *A Treatise on the Law of Crimes (Clark & Marshall)* § 10.01 (1958). In short, under common law, if the intervening party's acts were reasonably foreseeable as a result of the defendant's acts, the defendant cannot escape liability.

In light of the foregoing, we find that the evidence is sufficient to establish that Scott's "intervening" conduct was reasonably foreseeable and therefore not sufficiently independent to break the causal chain. Scott testified that Dunn told him to shoot Sprinkle, and Gleffe testified that Dunn told him that he and Scott intended to bind and rob Sprinkle and abandon him somewhere. Furthermore, Dunn himself testified that he knew Scott had access to the gun, that Scott was trying to get into the bathroom to subdue Sprinkle, and that Sprinkle and Scott were having some sort of struggle before the shooting. Viewing this evidence in a light most favorable to the prosecution, we cannot say that "reasonable minds must have entertained a reasonable doubt regarding the causal relationship in question." *Hallett*, 619 P.2d at 339 (Hall, J., dissenting). The jury reasonably could have concluded that but for Dunn's actions in planning and carrying out Sprinkle's kidnapping and robbery and in participating in the events leading up to Sprinkle's shooting, Sprinkle would not have been killed.

▪ We now turn to Dunn's more specific attacks on the reckless manslaughter judgment and his aggravated kidnapping conviction. We first address his claim that the search of his duffle bag violated the Fourth Amendment to the United States Constitution.[11]

The facts relevant to Dunn's Fourth Amendment claim are as follows: On the evening of the day of his arrest, Dunn told an officer that he needed some prescription

---

11. Dunn also challenged the search of his duffle bag under the search and seizure provision of article I, section 14 of the Utah Constitution. However, for the reasons set forth below, we decline to address his state constitutional claim.

The reconstructed record, *see supra* note 1, does not indicate which constitution, federal or state, Dunn relied on at trial in making his constitutional challenge to the search of his duffle bag. We do not have the benefit of reviewing any written motions or memoranda that may have been filed with the trial court. Thus, we cannot be sure that the transcript in the reconstructed record reflects the true scope of the arguments presented to the court.

However, Dunn's trial was in 1981, well before we extended the protections afforded by the search and seizure provision of the Utah Constitution beyond that afforded by the analogous clause in the United States Constitution. *See, e.g., Sims v. Collection Div. of the Utah State Tax Comm'n*, 841 P.2d 6 (Utah 1992); *State v. Thompson*, 810 P.2d 415, 416–18 (Utah 1991); *State v. Larocco*, 794 P.2d 460, 469–71 (Utah 1990). Consequently, it is reasonable to assume that Dunn did not base his argument at trial on the Utah Constitution. Even if he did, he most likely would not have urged that we undertake an analysis independent from that developed under the federal constitution, particularly in light of a 1981 case in which we stated that the federal and state search and seizure provisions were "identical." *See State v. Lee*, 633 P.2d 48, 50 (Utah), *cert. denied*, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981).

In light of these well-founded assumptions, we decline to address Dunn's illegal-search claim under the Utah Constitution. Utah appellate courts generally will not address a state constitutional argument made for the first time on appeal. *West v. Thomson Newspapers*, 835 P.2d 179, 184 n. 5 (Utah Ct.App.1992); *State v. Webb*, 790 P.2d 65, 77 (Utah Ct.App.1990); *see Lee*, 633 P.2d at 53. As the court of appeals has recognized, " '[T]he proper forum in which to commence thoughtful and probing analysis of state constitutional interpretation is before the trial court, not, as typically happens ... for the first time on appeal.' " *West*, 835 P.2d at 184 n. 5 (quoting *State v. Bobo*, 803 P.2d 1268, 1273 (Utah Ct.App.1990)).

Notwithstanding our preference that parties raise state constitutional claims first in the trial court, we note that we have discretion to address claims not raised at trial under exceptional circumstances. *Jolivet v. Cook*, 784 P.2d 1148, 1151 (Utah 1989), *cert. denied*, 493 U.S. 1033, 110 S.Ct. 751, 107 L.Ed.2d 767 (1990). Although the present case is unusual in the sense that we reinstated it after finding that Dunn may have received ineffective assistance of counsel during his first appeal, *Dunn v. Cook*, 791 P.2d 873 (Utah 1990) (plurality), and that we are relying on a reconstructed record, we do not find that this case presents the necessary exceptional circumstances to persuade us to review Dunn's state constitutional claim. We simply do not perceive any fundamental miscarriage of justice in declining to review this claim.

medicine from his duffle bag, which was still in the motor home. The officer asked Dunn if he could wait until the following day when the officer would be going to the motor home. According to the officer, Dunn said that he could wait and that he did not know exactly where the medicine was in the bag. Dunn, however, contends that he told the officer the medicine was at the bottom of the bag. In any event, the conversation ended with Dunn telling the officer to "[b]ring the duffle bag over, you know, and we can get the medicine out of there."

The next day, the police executed a search warrant for the motor home and its contents. They searched for six hours, finding the .25–caliber hand gun and the duffle bag. Rather than searching the bag there, however, they took it to the police station. An officer testified that they removed the bag because they had "a right to go through it at that time" and it was getting late (around 9 p.m.) and because of "Mr. Dunn's request." Just after returning to the police station, two officers and the county prosecutor searched the duffle bag. They first discovered a shaving bag, which held a smaller bag. Inside the smaller bag, they found .25–caliber cartridges. They later found Dunn's medicine among his clothes.

Dunn alleges that the search warrant gave the officers authority to search the duffle bag only within the confines of the motor home. When the bag was removed from the motor home, he argues, the warrant was rendered ineffective.[12] Dunn also contends that his consent to search the duffle bag was "coerced" because he was "in police custody and had a medical condition for which he needed prescription medicine." Alternatively, he argues that he specifically limited his consent to a search of the duffle bag for the medicine in his presence and contends that the cartridges would not have been in plain view if the police had stayed within these limits.

To address Dunn's Fourth Amendment claim, we consider two lines of search and seizure jurisprudence, one dealing with execution of search warrants and the other dealing with consent to search. We first discuss the principles governing these interrelated areas of law, and then we apply these principles to the facts before us.

■■■ The principles governing the execution of a search warrant are grounded in the purpose for such warrants. As a general rule, searches conducted without a warrant are per se unreasonable under the Fourth Amendment, subject only to a few specific and well-defined exceptions. *See Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *State v. Arroyo*, 796 P.2d 684, 687 (Utah 1990). A valid warrant authorizes the police to search when and where they otherwise would have no right, and consequently, the terms of the warrant dictate the scope of the officers' authority. *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 394 & n. 7, 91 S.Ct. 1999, 2004 & n. 7, 29 L.Ed.2d 619 (1971). A central purpose of the requirement of a warrant, issued under the authority of a neutral magistrate, is to protect against "general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971), *overruled on other grounds*, *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990). To this end, a warrant should leave nothing to the discretion of the officer executing it. *Marron v. United States*, 275 U.S. 192, 195, 48 S.Ct. 74, 75, 72 L.Ed. 231 (1927).

■■■ The principles governing the execution of search warrants also bear on the conduct of searches that occur without the prior approval of a magistrate. One of the narrow exceptions to the warrant requirement is brought into play when a defendant voluntarily consents to a search, thereby waiving the constitutional require-

---

**12.** Dunn's briefs do not make clear whether he objects solely to the removal of the bag from the motor home or whether he objects to both the removal of the bag and the delayed search. We assume that he relies on both bases.

ment of a warrant. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973); *Arroyo,* 796 P.2d at 687. "Generally, whether the requisite voluntariness exists depends on 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of' police conduct." *Arroyo,* 796 P.2d at 689 (quoting *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047); *accord State v. Thurman,* 846 P.2d 1256, 1262 (Utah 1993). Even when a constitutionally valid consent is given, the scope of the ensuing search must be limited to the scope of the consent, and police activity that exceeds the scope of the consent violates the Fourth Amendment. *See Florida v. Jimeno,* —— U.S. ——, ——, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991); *Arroyo,* 796 P.2d at 692. The terms of the consent limit police authority to search in the same fashion as the terms of a search warrant.

We now consider Dunn's contention that the search of his duffle bag was unconstitutional. Dunn does not challenge the warrant or the State's position that the warrant authorized the search of the motor home and its contents for evidence relating to the crime. He simply claims that once they removed the duffle bag from the vehicle, took it to the police station, and searched it there, the officers exceeded the scope of the warrant. For the following reasons, we find Dunn's argument to be without merit.

▬ First, his claim assumes that the warrant authorized a search of the motor home's contents only if the contents remained within the motor home. Although the warrant has been destroyed,[13] nothing in the record suggests why the officers would have had to search the contents of the motor home within its confines. In-

deed, given the limited space in the motor home—a cab-over camper built on a van chassis—and the fact that it contained the luggage of three persons, it would be unreasonable to presume that the magistrate authorizing the search would have imposed such a limitation. Furthermore, Dunn does not explain how the removal of the duffle bag, without more, violated any expectation of privacy he might have had in its contents. We conclude that the removal of the duffle bag from the motor home, standing alone, fails to establish that the police exceeded the scope of the warrant.

▬ We also reject Dunn's apparent contention that the police exceeded the scope of the warrant by waiting until late in the evening of the day the motor home was searched (the day after the arrest of Dunn and Scott) to search the duffle bag. The facts do not indicate that the magistrate would have imposed any significant time limitation, and we find no reason to assume that the search would have delayed the movement of the motor home so as to infringe on anyone's interests. The owner of the motor home was dead, those in possession of it were in jail charged with his murder, and the record suggests no other parties who were in a position to assert an interest in it. Moreover, under the circumstances, we do not think it was unreasonable to delay the search by a few hours. The officers did not intentionally delay searching the duffle bag; rather, they simply took it to the station at the conclusion of their search of the motor home around 9 p.m. so that they could review its contents there and because Dunn requested that the duffle bag be brought there.[14] *Cf. Chambers v. Maroney,* 399 U.S. 42, 52 & n. 10, 90 S.Ct. 1975, 1982 & n. 10, 26 L.Ed.2d 419 (1970); *United States v. McKinnell,* 888 F.2d 669, 673 (10th Cir.1989), *rev'd in part on other grounds,* 931 F.2d 64 (10th Cir. 1991).

---

**13.** *See supra* note 1.

**14.** The reconstructed record suggests that the search of the motor home was conducted over two or three days, beginning on August 15th and ending possibly as late as August 17th, and

that the search of Dunn's duffle bag took place within this period (on the night of August 15th). This suggests that the warrant allowed the police to conduct the search at least over that period.

Finally, even giving Dunn the benefit of the doubt as to the warrant's contents and assuming that the search had exceeded the scope of the warrant's authorization in either place or time, the fact remains that Dunn requested that the officers bring the duffle bag to the police station. This consent expanded the scope of the search initiated under the warrant and forecloses any objection to either the removal of the bag from the motor home or the delayed search of the bag at the police station.

Dunn attempts to avoid the obvious effect of his request by arguing that his consent to the removal of the bag from the motor home and the subsequent search at the station was not voluntary because it was not a product of his free will. The only fact upon which he relies for this contention is that he was in custody and "needed" the prescription medicine in his duffle bag. He argues that these circumstances indicate his consent was coerced.

 We agree with Dunn's contention that the prosecution's burden is "particularly heavy" when the defendant's consent was obtained while he or she was in custody. *See Judd v. United States,* 190 F.2d 649, 651 (D.C.Cir.1951); *Guzman v. State,* 283 Ark. 112, 672 S.W.2d 656, 660 (1984); *see also* 3 Wayne R. LaFave, *Search & Seizure* § 8.2(b), at 182 (1987); *cf. State v. Ramirez,* 817 P.2d 774, 786 (Utah 1991); *United States v. Hall,* 565 F.2d 917, 920 (5th Cir.1978). However, the fact that defendant was in custody is not enough, standing alone, to demonstrate the lack of voluntariness. *Thurman,* 846 P.2d at 1273; *State v. Whittenback,* 621 P.2d 103, 106 n. 14 (Utah 1980) (citing *State v. White,* 577 P.2d 552, 554 (Utah 1978)); *see United States v. Watson,* 423 U.S. 411, 424–25, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). Nothing the police did gave rise to the fact that he needed and requested the medicine.[15] *See United States v. Lewis,* 921 F.2d 1294, 1302 (D.C.Cir.1990). We also note that Dunn could not have reason-

ably expected the police to respond to his request in any other way. Dunn surely did not think the police would allow him to leave on his own recognizance to pick up the medicine or arrange for a third party to pick it up. *Cf. Jimeno,* —— U.S. at —— ——, 111 S.Ct. at 1803–04. Nor could he expect the officers to bring his duffle bag to the jail and hand it to him without first carefully looking through the contents. He was, after all, under arrest and jailed for the most serious of crimes. Consequently, we hold that Dunn's Fourth Amendment rights were not violated when the police removed his duffle bag and subsequently searched it at the police station.

Dunn next claims that the trial court committed reversible error in allowing the prosecution to question him about his prior conviction. Before trial, Dunn moved to suppress evidence of a California conviction for assault with a deadly weapon. The trial judge held a hearing on the motion and ruled from the bench. Dunn contends that the judge ruled that the prosecution could not adduce evidence of Dunn's prior conviction so long as Dunn did not introduce evidence of his own character. The State, on the other hand, contends that the judge barred the evidence of the prior conviction only from the prosecution's case-in-chief.

 The case went to trial without clarification of the ruling. During the defense's case-in-chief, several witnesses testified before Dunn took the stand. No character evidence was adduced. After Dunn finished testifying, the prosecutor asked that the judge allow the state to impeach Dunn by cross-examining him about the prior conviction. Dunn's trial counsel objected, arguing that the pretrial ruling precluded admission of the evidence. The judge, relying on statutory and case law authority that he apparently was not aware of at the time of the pretrial ruling, overruled the defense counsel's objection and allowed Dunn to be cross-examined

---

**15.** Dunn has not informed us and the record does not indicate what kind of medicine was in

his duffle bag or how important it was for him to receive it.

about the prior conviction.[16]

■■■ Before our court, Dunn argues that the trial court committed reversible error when it reversed its pretrial ruling and allowed questioning about his prior conviction. He maintains that if he had known that the prior conviction was going to be admissible, he would not have taken the stand or, at the very least, he would have deflected the impact of the prior conviction by disclosing it during his case-in-chief.[17]

We have read the court's pretrial ruling and find it ambiguous. For purposes of this appeal, we assume, as Dunn contends, that the pretrial ruling did exclude evidence of Dunn's prior conviction. However, for the reasons set forth below, we conclude that Dunn is precluded from raising a claim of error based on his reliance on that pretrial ruling.

■■■■ We have held repeatedly that on appeal, a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error.[18] This rule, which is known as the "invited error" doctrine, see *State v. Tillman,* 750 P.2d 546, 560–61 (Utah 1987); *State v. Perdue,* 813 P.2d 1201, 1205 (Utah

Ct.App.1991), has two principal purposes. First, it fortifies our long-established policy that the trial court should have the first opportunity to address the claim of error. *See, e.g., State v. Emmett,* 839 P.2d 781, 785 (Utah 1992); *State v. Eldredge,* 773 P.2d 29, 35–36 (Utah), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989); *State v. Lesley,* 672 P.2d 79, 82 (Utah 1983); *State v. McCardell,* 652 P.2d 942, 947 (Utah 1982); *State v. Peterson,* 121 Utah 229, 236, 240 P.2d 504, 507 (1952). Second, it discourages parties from intentionally misleading the trial court so as to preserve a hidden ground for reversal on appeal. *See, e.g., State v. Bullock,* 791 P.2d 155, 158–59 (Utah 1989), *cert. denied,* 497 U.S. 1024, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990); *State v. Butterfield,* 784 P.2d 153, 157 (Utah 1989); *State v. Medina,* 738 P.2d 1021, 1023 (Utah 1987); *Perdue,* 813 P.2d at 1205; *State v. Morgan,* 813 P.2d 1207, 1211 (Utah Ct.App.1991). Of course, if counsel's decision in leading the court into error falls below the standard of reasonable professional practice, we may find that counsel was ineffective.[19] *See, e.g., Bullock,* 791 P.2d at 158–59.

In the instant case, Dunn's trial counsel moved to exclude the evidence of his prior

**16.** The cross-examination of Dunn about his prior conviction proceeded as follows:
Q. Is it true that you have a felony conviction, a prior felony conviction?
A. Yes.
Q. What is that conviction?
A. Assault with a deadly weapon.
Q. Did that assault with a deadly weapon pertain to abduction of a girl in California?
A. Yes, it did.
Q. When did that take place?
Defense counsel: Objection, Your Honor.
The court: Your objection's overruled.
A. 1973.

**17.** At oral argument, Dunn claimed that the judge's decision to admit evidence of the prior conviction after he testified violated his Fifth Amendment right against self-incrimination and his Fourteenth Amendment right to a fair trial. Because there is no indication in the record that these constitutional bases were raised at trial, we consider them waived. *See, e.g., State v. Johnson,* 774 P.2d 1141, 1144–45 (Utah 1989); *State v. Eldredge,* 773 P.2d 29, 35 (Utah), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989); *State v. McCardell,* 652 P.2d 942, 947 (Utah 1982). Even if Dunn's trial counsel raised

these grounds in a written motion that was destroyed, *see supra* note 1, we would consider them waived because they were not raised in his briefs to this court. *See* Utah R.App.P. 24(a)(9).

**18.** *See, e.g., State v. Bullock,* 791 P.2d 155, 158 (Utah), *cert. denied,* 497 U.S. 1024, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1989); *State v. Tillman,* 750 P.2d 546, 560–61 (Utah 1987); *State v. Medina,* 738 P.2d 1021, 1023 (Utah 1987); *Morgan v. Quailbrook Condominium Co.,* 704 P.2d 573, 579 (Utah 1985); *Associated Indus. Devs., Inc. v. Jewkes,* 701 P.2d 486, 489 (Utah 1984); *State v. Fair,* 28 Utah 2d 242, 244, 501 P.2d 107, 108 (1972); *State v. Stone,* 18 Utah 2d 289, 291, 422 P.2d 194, 195 (1967); *State v. Gleason,* 17 Utah 2d 150, 151, 405 P.2d 793, 794–95 (1965); *State v. Thompson,* 110 Utah 113, 130–31, 170 P.2d 153, 162 (1946).

**19.** Dunn has not asserted that his trial counsel was ineffective in requesting the pretrial ruling on the admissibility of evidence of his prior conviction or in undertaking any actions following from that pretrial ruling.

conviction and apparently provided the trial court with citations to the authority on which the court based its pretrial ruling.[20] However, contrary to Dunn's position before the trial judge, the law at the time clearly allowed evidence of prior convictions to be admitted for impeachment purposes without any restriction. *See* Utah Code Ann. § 78-24-9 (1977); Utah R.Evid. 21 (1977) (superseded 1983); *State v. Bennett*, 30 Utah 2d 343, 345, 517 P.2d 1029, 1031 (1973), *cert. denied*, 416 U.S. 992, 94 S.Ct. 2403, 40 L.Ed.2d 771 (1974). *See generally State v. Banner*, 717 P.2d 1325, 1331–34 (Utah 1986).[21] Dunn's counsel's actions in making the motion in limine without informing the trial judge of the controlling law led the trial court into error. Therefore, Dunn is precluded from asserting that the pretrial ruling misled him into taking the stand.

■■■ Dunn next argues that the trial judge erred in admitting a photograph of the decedent's body in the bathroom of the motor home. In admitting the photograph, the trial judge relied on Utah Rule of Evidence 403, which provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ... or needless presentation of cumulative evidence." Utah R.Evid. 403. In reviewing a trial court's ruling on the admissibility of evidence under rule 403, we will not overturn the court's determination unless it was an "abuse of discretion." *State v. Hamilton*, 827 P.2d 232, 239–40 (Utah 1992); *see State v. Verde*, 770 P.2d 116, 120 (Utah 1989); *State v. Cloud*, 722 P.2d 750, 752 (Utah 1986). To state the matter more precisely, we determine whether the trial court's finding that the evidence was admissible was "beyond the limits of reasonability." *Hamilton*, 827 P.2d at 240. Even if we find that the trial court's decision to admit was "beyond the limits of reasonability," we will reverse only if the error was harmful, i.e., if absent the error there is a reasonable likelihood of an outcome more favorable to the defendant. *Id.; Verde*, 770 P.2d at 121.

■■■ When applying rule 403, it is necessary to determine first whether the proffered evidence has an unusual propensity to unfairly prejudice, inflame, or mislead the jury. *State v. Dibello*, 780 P.2d 1221, 1229 (Utah 1989); *State v. Lafferty*, 749 P.2d 1239, 1256 (Utah 1988). If not, we

---

**20.** The reconstructed record does not include a written motion to exclude the prior conviction. *See supra* note 1. However, the trial transcript suggests that there was a written motion that cited to the authority on which the judge relied. The transcript indicates that for the pretrial ruling, the judge relied on rule 55 of the Utah Rules of Evidence (since revised) and unidentified "United States cases." Rule 55 at that time read in pertinent part:

> [E]vidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed another crime or civil wrong on another specified occasion but ... such evidence is admissible when relevant to prove some other material fact including absence of mistake or accident, motive, opportunity, intent, preparation, plan, knowledge or identity.

Utah R.Evid. 55 (1977) (superseded 1983).

**21.** For his ruling made during trial, the judge relied on section 78-24-9 of the Code (since superseded), Utah Rule of Evidence 21 (also since superseded), and this court's opinion in *Bennett*, 30 Utah 2d 343, 517 P.2d 1029. Section 78-24-9 read:

> A witness must answer questions legal and pertinent to the matter in issue, although his answer may establish a claim against himself; but he need not give an answer which will have a tendency to subject him to punishment for a felony; nor need he give an answer which will have a direct tendency to degrade his character, unless it is to the very fact in issue or to a fact from which the fact in issue would be presumed. *But a witness must answer as to the fact of his previous conviction of felony.*

Utah Code Ann. § 78-24-9 (1977) (emphasis added). Rule 21 stated, "Evidence of the conviction of a witness for a crime not involving dishonesty or false statement shall be inadmissible for the purpose of impairing his credibility, *except as otherwise provided by statute.*" Utah R.Evid. 21 (1977) (emphasis added) (superseded 1983). In *Bennett*, we held that "a defendant who voluntarily takes the witness stand *must answer to the fact of a prior conviction of felony if such is the case.*" 30 Utah 2d at 346, 517 P.2d at 1031 (emphasis added).

indulge a presumption in favor of admissibility. *Dibello*, 780 P.2d at 1229. On the other hand, if the evidence does have an unusual propensity to unfairly prejudice, inflame, or mislead, the presumption shifts. In such a case, the evidence's potential for unfair prejudice is presumed to outweigh its probativeness, and the burden is on the proponent to show that the evidence has unusual probative value. *Id.; Lafferty*, 749 P.2d at 1256. We reverse the presumption in favor of admissibility because these categories of evidence are "uniquely subject to being used to distort the deliberative process and skew a trial's outcome." *Dibello*, 780 P.2d at 1229; *accord Lafferty*, 749 P.2d at 1256. For obvious reasons, gruesome photographs of a homicide victim's corpse will unfairly prejudice and inflame the jury and therefore require the proponent to show that they have unusual probative value.[22] *See Dibello*, 780 P.2d at 1230; *Lafferty*, 749 P.2d at 1256; *Cloud*, 722 P.2d at 753; *cf. State v. Garcia*, 663 P.2d 60, 63–64 (Utah 1983).

█ We find that the photograph at issue is not gruesome. It reveals only the decedent's back and part of his left arm in the doorway of the bathroom. A substantial part of the decedent's back is covered by an identification placard that was placed on top of his body when the photograph was taken. The photograph shows bloodstained clothing, but not the decedent's wounds or any mutilation or deformity caused by the shooting. In short, the restricted view of the body greatly minimizes the photograph's visual impact. There is little here that makes this photograph

uniquely subject to being used to distort the deliberative process and skew a trial's outcome. *Dibello*, 780 P.2d at 1229.

█ Because we find that the photograph is not gruesome, Dunn must overcome rule 403's presumption in favor of admitting the proffered evidence. We agree with Dunn that the probative value of the photograph is not obvious from the record. However, he has not shown that the photograph's probativeness, albeit minimal at best, is "substantially" outweighed by the danger of unfair prejudice. Utah R.Evid. 403. Therefore, we find that the court did not exceed the bounds of reasonability in finding that the photograph's potential for unfair prejudice did not outweigh its probativeness. *See Hamilton*, 827 P.2d at 240.

█ We now turn to Dunn's assertion that the prosecutor made improper comments during his closing argument to the jury. Dunn identifies two specific comments as improper. The first occurred when the prosecutor challenged Dunn's claim that he acted under compulsion by quoting Dunn's request for a lawyer when confronted by the arresting officer:

> What did Officer Larsen testify about [Dunn's] demeanor? He came up to the vehicle and Mr. Dunn told him this was a drive out unit from California. How did he appear? Calm, very calm. Then what happened? Officer Larsen found the body and walked up to him and said, "What can you tell me about the body back there?" What does Mr. Dunn say? "I want a lawyer. I want a lawyer." Is

---

22. In *State v. Valdez*, 748 P.2d 1050 (Utah 1987), we appeared to apply an analysis that first determined whether the proffered photograph was gruesome or "negligibly gruesome." *Id.* at 1055. This mischaracterizes the test for admissibility of photographs under rule 403. The threshold question, as discussed in the text, is whether the photograph is "gruesome" or "not gruesome"; there is no intermediate ground. Also, in *Valdez*, we appeared to consider the question of gruesomeness as one of fact, stating, "The resolution of such issues is one within the discretion of the trial judge." *Id.* at 1054 (citation omitted). Notwithstanding this statement, close ex-

amination of that case reveals that we actually reviewed the trial court's determination of gruesomeness for correctness. The correctness standard of review should be applied to the gruesomeness determination because an appellate court is in as good a position as the trial court to view the photograph. *See State v. Thurman*, 846 P.2d 1256, 1272 (Utah 1993). More important, the characterization as "gruesome" is less a factual question than a legal one because it is a predicate for shifting the presumption of admissibility that normally obtains under rule 403. *See Dibello*, 780 P.2d at 1229; *cf. Thurman*, 846 P.2d at 1265, 1272.

that a scared man? Is that a man that's so frightened of Howard Scott that he doesn't know what to do or how to get away? "I want a lawyer."

Dunn's trial counsel objected, and the objection was overruled. Dunn now renews his claim, arguing that the prosecutor's reference to his request for a lawyer impermissibly compromised his Fifth and Sixth Amendment rights.

We find this claim to be without merit. The record shows that Dunn's trial counsel purposely elicited the arresting officer's testimony about his conversation with Dunn during cross-examination. The exchange took place as follows:

Q. [Dunn's trial counsel] You walked out of the motor home and you asked Mr. Dunn another question, didn't you?

A. [officer] Yes.

Q. What was that question?

A. I said, "What can you tell me about the guy in the motor home?"

. . . .

Q. And Mr. Dunn responded to your question; didn't he?

A. Yes.

Q. Do you recall the exact words that he said?

A. As near as I can remember he said, "I want a lawyer. All I was told to do was drive."

Q. In your report, Mr. Larsen, you say, "I want an attorney. All I was told was to drive."

A. Right.

Q. So what you're telling us today is the same as in your report?

A. Yes.

Q. And that's what Mr. Dunn, in fact, said on that occasion?

A. Yes.

At the close of evidence, Dunn's counsel argued to the jury that this testimony supported Dunn's compulsion defense. In response, the prosecutor argued to the jury that Dunn's request for an attorney showed he was calm and collected when confronted by the officer. The context of the prosecutor's comment and the comment itself indicate that the prosecutor meant to emphasize that Dunn's behavior was inconsistent with his compulsion theory. In short, Dunn attempted to bolster his defense by adducing evidence that the prosecutor then legitimately used for rebuttal on the same point. *See State v. Tillman*, 750 P.2d 546, 560–61 (Utah 1987); *State v. Eagle*, 611 P.2d 1211, 1214 (Utah 1980).

We have observed repeatedly that counsel for each side has considerable latitude and may discuss fully his or her viewpoint of the evidence and the deductions arising therefrom. *See, e.g., Tillman*, 750 P.2d at 560, 561 n. 45; *State v. Creviston*, 646 P.2d 750, 754 (Utah 1982); *State v. Valdez*, 30 Utah 2d 54, 60, 513 P.2d 422, 426 (1973). Therefore, we conclude that even assuming that Dunn's request for counsel was an exercise of his constitutional rights,[23] he forfeited his right to prevent the prosecutor from commenting on his request for counsel because he adduced and relied on the evidence as part of his compulsion defense.[24] *See Tillman*, 750 P.2d at 560–61; *Eagle*, 611 P.2d at 1214; *cf. Carillo v. Brown*, 807 F.2d 1094, 1101 (1st Cir.1986).

Dunn's second assertion of prosecutorial misconduct arises from the prosecutor's

---

**23.** The parties devoted considerable argument to the issue of whether Dunn's Fifth or Sixth Amendment rights had attached when he made the request for counsel. Because we hold that the prosecutor's comment on Dunn's request for counsel constitutes legitimate rebuttal, we do not reach this issue. We recognize, however, that several courts have found similar prosecutorial comment to be constitutional error. *See, e.g., United States ex rel. Macon v. Yeager*, 476 F.2d 613, 616–17 (3d Cir.), *cert. denied*, 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973); *Zemina v. Solem*, 438 F.Supp. 455, 465–66 (D.S.D.1977), *aff'd*, 573 F.2d 1027 (8th Cir.1978); *People v. Meredith*, 84 Ill.App.3d 1065, 40 Ill.Dec. 214, 219–20, 405 N.E.2d 1306, 1311–12 (1980).

**24.** It is worth noting that the prosecutor came close to unfairly mischaracterizing the evidence by failing to repeat to the jury Dunn's complete statement, i.e., "I want a lawyer. All I was told was to drive." However, in light of the discussion in the text, we cannot say that the prosecutor's reference to Dunn's request for counsel crossed the line into improper comment.

comment to the jury that it should be mindful of its obligation to society in deciding whether to return a guilty verdict:

> [E]ven more importantly than Ernest Sprinkle, Robert Dunn and Howard Scott or anyone else is the impact that every jury decision has on the criminal system and that's the most important factor you need to consider in reaching a just and honest decision here today because you're going to have to live with it and so is society and you are all aware of the publicity that surrounds this case, that surrounds any First Degree Murder case and the impact that it has when the jury reaches the verdict one way or another. Make sure before you determine that there is a reasonable doubt, make sure that before you elevate some of the concerns to the point of a reasonable doubt that you are being fair to the most important segment of society at large....

Although Dunn did not object to this statement, he now claims that the remark constitutes plain error because it improperly implies that the jury, in weighing the evidence, was obliged to consider the judgment of society on the merits of the case.

 We have twice held that similar remarks by the same prosecutor constituted error. *State v. Andreason,* 718 P.2d 400, 402 (Utah 1986) (per curiam); *State v. Smith,* 700 P.2d 1106, 1112 (Utah 1985). Because there is no material difference in the comments complained of here and those in *Andreason* and *Smith,* we conclude that the prosecutor's remarks in the instant case also constitute error. However, our analysis does not end here. To find plain error, we must determine that the error was obvious and that it was prejudicial. *State v. Eldredge,* 773 P.2d 29, 35 (Utah), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989); *State v. Verde,* 770 P.2d 116, 122 (Utah 1989). We turn first to the element of prejudice. If there is no prejudice, we have no reason to reach the other elements of the analysis. *See State v. Hamilton,* 827 P.2d 232, 240 & n. 4 (Utah 1992).

 The prosecutor's reference to the jury's societal obligation does not rise to the level of federal constitutional error. *See United States v. Stead,* 422 F.2d 183, 184 (8th Cir.), *cert. denied,* 397 U.S. 1080, 90 S.Ct. 1534, 25 L.Ed.2d 816 *cert. denied,* 398 U.S. 966, 90 S.Ct. 2181, 26 L.Ed.2d 551 (1970); *Zemina v. Solem,* 438 F.Supp. 455, 465 (D.S.D.1977), *aff'd,* 573 F.2d 1027 (8th Cir.1978). Therefore, applying state law, we need consider only whether, absent the comment, there would be a reasonable likelihood of an outcome more favorable to Dunn; in other words, we need determine only whether our confidence in the verdict is undermined. *See Verde,* 770 P.2d at 123; *State v. Bell,* 770 P.2d 100, 106 (Utah 1988); *State v. Knight,* 734 P.2d 913, 919–20 (Utah 1987). For the reasons explained below, we conclude that the prosecutor's reference to the jury's societal obligation does not undermine our confidence in Dunn's conviction for aggravated kidnapping or in the judgment of reckless manslaughter we have directed against him.

As we have explained, the record contains substantial evidence of Dunn's guilt for aggravated kidnapping. *See Smith,* 700 P.2d at 1112. The evidence supporting his kidnapping conviction is simply not as weak as that in cases where we have reversed a conviction on the basis of improper prosecutorial comment. *See, e.g., Andreason,* 718 P.2d at 403; *State v. Troy,* 688 P.2d 483, 487 (Utah 1984). As we said in *Andreason,* "When the evidence in the record is circumstantial or sufficiently conflicting, jurors are more likely influenced by an improper argument. In such instances, they are more susceptible to the suggestions that factors other than the evidence before them should determine a defendant's guilt or innocence." 718 P.2d at 403; *accord Smith,* 700 P.2d at 1112; *Troy,* 688 P.2d at 486–87. In light of the substantial evidence supporting the aggravated kidnapping charge, we think there is little possibility that the jurors were further influenced by the prosecutor's remarks.

In regard to Dunn's guilt of reckless manslaughter, we acknowledge that the ev-

idence is weaker. However, in making our harmlessness determination, we need not rely solely on the evidence supporting that offense in determining the likelihood of prejudice. *See Tillman*, 750 P.2d at 555; *Andreason*, 718 P.2d at 403. Here, after the prosecutor made the comment regarding the jury's societal obligation and finished his initial closing argument, Dunn's trial counsel responded by arguing to the jurors that their duty to society must be offset by being fair to defendant:

> [Sprinkle's killing] is as abhorrent to me as it is to you, but I would suggest, members of the jury, that it's a much graver injustice ... that a man's life be forfeited to the State for a crime of which he's innocent. Your duty is to be fair to society and to render a verdict accordingly but you also have the duty to be fair to that man sitting over there. The duty doesn't run solely to the people of the State of Utah. You have a duty to be fair to him equally as your fairness to the State ought to be.

After Dunn's trial counsel completed his closing statement, the prosecutor restricted his surrebuttal comments to the evidence and made no further mention of societal obligations. We think that defense counsel's remark helped to ameliorate the harmful effect of the prosecutor's improper comment.

In addition, the trial judge's instructions to the jury further weakened any improper impact of the prosecutor's comment. The jury was told that "[t]he law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling," that "you will conscientiously and dispassionately consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict regardless of what the consequences of such verdict may be." The judge further instructed the jury not to consider the statements of counsel as evidence. In past cases, we have found similar cautionary instructions helpful in neutralizing the harmfulness of error. *See*

*Tillman*, 750 P.2d at 555; *Smith*, 700 P.2d at 1112; *State v. Tucker*, 709 P.2d 313, 316 (Utah 1985), *abandoned on other grounds*, *State v. Long*, 721 P.2d 483 (Utah 1986); *Creviston*, 646 P.2d at 754; *Valdez*, 30 Utah 2d at 60, 513 P.2d at 426. In light of the foregoing, we conclude that, on balance, the error in the instant case was harmless.

 Dunn next asserts that he was denied effective assistance of counsel, as guaranteed by the Sixth Amendment. To show ineffective assistance of counsel, a defendant must (i) identify specific acts or omissions by counsel that fall below the standard of reasonable professional assistance when considered at the time of the act or omission and under all the attendant circumstances, and (ii) demonstrate that counsel's error prejudiced the defendant, i.e., that but for the error, there is a reasonable probability that the verdict would have been more favorable to the defendant. *See Strickland v. Washington*, 466 U.S. 668, 690–91, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984); *State v. Verde*, 770 P.2d 116, 119, 124 n. 15 (Utah 1989); *State v. Lovell*, 758 P.2d 909, 913 (Utah 1988); *State v. Frame*, 723 P.2d 401, 405 (Utah 1986) (per curiam); *State v. Geary*, 707 P.2d 645, 646 (Utah 1985). This prejudice test is equivalent to the harmfulness test we apply in determining plain error, *Verde*, 770 P.2d at 124 n. 15, or reversible error, *State v. Eldredge*, 773 P.2d 29, 35 (Utah), *cert. denied*, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989).

 In determining whether counsel's performance is constitutionally deficient, we presume that counsel has rendered adequate assistance. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. Thus, if the challenged act or omission might be considered sound trial strategy, we will not find that it demonstrates inadequacy of counsel. *See State v. Bullock*, 791 P.2d 155, 160 (Utah), *cert. denied*, 497 U.S. 1024, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1989); *State v. Carter*, 776 P.2d 886, 894 (Utah

1989); *State v. Julian*, 771 P.2d 1061, 1063–64 (Utah 1989); *State v. Medina*, 738 P.2d 1021, 1023–24 (Utah 1987). Moreover, when confronted with a claim of ineffective assistance, we may choose not to consider the adequacy of counsel's performance if we determine that any claimed error was not harmful. *Carter*, 776 P.2d at 893; *Verde*, 770 P.2d at 119; *Lovell*, 758 P.2d at 913.

Dunn first argues that his trial counsel rendered ineffective assistance by failing to request a cautionary instruction on uncorroborated accomplice testimony. Dunn claims that section 77–17–7 of the Code entitled him to such an instruction. Section 77–17–7 states that a cautionary instruction must be given if the accomplice testimony is "uncorroborated" and "the trial judge finds the testimony of the accomplice to be self contradictory, uncertain or improbable." Utah Code Ann. § 77–17–7; *see State v. Neeley*, 748 P.2d 1091, 1096 (Utah), *cert. denied*, 487 U.S. 1220, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988). Dunn argues that because Scott's testimony is uncorroborated and patently self-contradictory, he was entitled to the cautionary instruction. Dunn concludes that he was prejudiced by this error because Scott's testimony provided the only direct evidence supporting the prosecution's claim that Scott and Dunn were accomplices.

■ Even assuming error, we find that Dunn has not been prejudiced by his trial counsel's failure to request the uncorroborated accomplice testimony instruction. As we have discussed earlier in this opinion, the evidence supporting Dunn's conviction for aggravated kidnapping is substantial, and its sufficiency does not hinge on Scott's testimony. Consequently, there is no reasonable likelihood that the jury would have found Dunn innocent of aggravated kidnapping if the jury had been given an uncorroborated accomplice testimony instruction.

Although the evidence supporting Dunn's guilt of reckless manslaughter is

not as strong, other circumstances lead us to conclude that the assumed error was harmless as it relates to that offense. First, the jury heard testimony from the county attorney that Scott had promised to testify against Dunn in exchange for a reduction in charge from first to second degree murder. Consequently, the jury was aware that Scott had a motive to tailor his testimony to favor the prosecution. In addition, the jury was instructed to take into account bias, interest, or motive in assessing credibility.

Second, Scott admitted before the jury that he was a pathological liar, he was repeatedly impeached, and both parties emphasized in argument to the jury that aspects of his testimony were not to be believed. After Scott testified that he and Dunn planned to drive to Denver and lure Sprinkle's wife into the motor home, the following exchange took place:

Q. [prosecutor] Then what?

A. [Scott] So, after she got in there, I guess we would do that, he was going to kill her and take the motor home down to Mississippi, Louisiana, and dump that motor home and everything in some quick sand down there.

Q. You didn't object to that; did you?

A. Yes, I did.

Q. Oh, Howard, you did not.

A. Oh, yes.

Q. You've told a lot of stories different than that one; haven't you?

A. I've told thousands.

Q. You what?

A. Yes.

Q. Are you telling the truth today?

A. Yes.

[prosecutor] I have no further questions.

Q. [defense counsel] How many times have you lied about this, Mr. Scott?

A. I don't count them.

Q. Many times; haven't you?

A. I guess so. I don't count them.

Q. Right after you were arrested on the 14th of August, you were taken down to the Salina City Hall and interviewed by some police officers; weren't you?

A. I guess so.

Q. Well, don't you know?

A. (No answer).

Q. Do you know, Mr. Scott?

A. If you say so.

Q. What do you say?

A. I guess I was. I don't know.

Q. You don't know if you were taken to the Salina City Hall and interviewed?

A. I guess.

Q. And everything that you told the officers at that time was a lie; wasn't it?

A. It all depends on how you see it.

Q. You did tell them a lot of lies though; didn't you? You told them on that day in Salina that you didn't shoot Mr. Sprinkle; didn't you?

A. (No answer).

Q. Answer out loud, Mr. Scott.

A. I don't know if I did or not.

. . . .

Q. You admit that you shot Mr. Sprinkle; don't you?

A. I only did it because Dunn said so.

Q. Do you always shoot people because someone else says so?

A. I'm a sick man.

Q. You're a sick man?

A. I'm a sick man in the head.

. . . .

Q. Do you recall saying to law enforcement officials on August 14th that, "The Old Man [Sprinkle] laid down and went to sleep and I did a little driving?"

A. No.

Q. Didn't you do a little driving after the Old Man laid down and went to sleep?

A. No.

Q. But you said that to law enforcement officers on the 14th of August?

A. I told you I lie.

Q. How much do you lie?

A. How much?

Q. Yes.

A. I don't even know.

On redirect, the prosecutor continued to emphasize Scott's lack of credibility:

Q. [prosecutor] About the only time we can believe you is when there's something there in writing to back you up; isn't it?

A. (No answer).

Q. You've seen quite a few doctors who gave a diagnosis on you as a pathological liar; haven't they?

A. Yes.

Q. It's hard to argue with; isn't it?

A. It sure don't.

Q. Maybe we could hold you to the truth one of these times, Mr. Scott.

A. You might.

These exchanges obviously alerted the jury to Scott's propensity to lie. This propensity was underscored during closing argument by both the prosecutor and Dunn's trial counsel. For example, the prosecutor referred to Scott as that "man who's too dumb to make up even a good lie on the stand." Dunn's trial counsel commented at length about Scott's credibility:

Now, I realize the credibility of Mr. Scott is big. It is his lying, his inconsistency, when he gets on the stand, he denies having made a statement to the prosecution only ten days earlier, denies having entered into an [arrangement to testify against Dunn in return for a reduced charge], very incredible, very incredible, but you are the judges of that credibility and you're going to have to be shrewd enough to weigh the evidence, shift the evidence but, if you will, you can see something emerging from Mr. Scott. One of the things you can see emerging was a fairly shrewd little plan on his

part, given his state of mind. It didn't last long and it wasn't successful, but he was trying. It was a cover up there on his part.

He has been convicted and there's no reason for him to lie about anything but on the stand he did, over and over and over again.

Adding weight to counsels' remarks, the judge instructed the jury that it could entirely disregard testimony if it found any portion of it incredible: "If you believe any witness has wilfully testified falsely, as to any material fact in the case, you are at liberty to disregard the whole of the testimony of such witness, except as he may have been corroborated by other credible witnesses or credible evidence." We have held that it "is not error to refuse a proposed instruction if the point is properly covered in the other instructions." *State v. Hamilton,* 827 P.2d 232, 238 (Utah 1992) (quoting *State v. Sessions,* 645 P.2d 643, 647 (Utah 1982)). Although we do not need to apply this rule to resolve the issue before us, it supports our reliance on the general credibility instruction given to the jury to find no harm.

Together, these factors accomplished whatever benefit Dunn would have achieved from an uncorroborated accomplice testimony instruction. *Cf. State v. Hackford,* 737 P.2d 200, 206 (Utah 1987). Therefore, we conclude that any error of counsel in failing to request that instruction did not prejudice Dunn.

 Dunn also claims that his trial counsel was ineffective in failing to request an instruction on the prosecution's burden of proof on his defense of compulsion. Although an instruction explaining the compulsion defense was given to the jury, the instruction did not mention the burden of proof. Dunn cites *State v. Hansen,* 734 P.2d 421, 429 (Utah 1986), for the proposition that failure to instruct the jury of the prosecution's burden of proof on an affirmative defense is error. Therefore, Dunn argues, his counsel erred in not requesting

such an instruction and because the crux of his defense was the compulsion claim, he has been prejudiced.

The State responds by citing the rule that instructions must be read and evaluated as a whole. *See State v. Johnson,* 774 P.2d 1141, 1146 (Utah 1989) (opinion of Hall, C.J., joined by Howe, Assoc. C.J.). It argues that several other instructions sufficiently informed the jury that Dunn bore no burden of proof. For example, one instruction informed the jury that to convict, the evidence must "exclude every reasonable hypothesis other than that of the guilt of the Defendant." Moreover, the State argues, *Hansen* does not require a burden of proof instruction for an affirmative defense.

The arguments of both Dunn and the State miss the mark. Dunn cites no authority in effect at the time of his trial that would have entitled him to the burden-of-proof instruction. To establish a claim of ineffectiveness based on an oversight or misreading of law, a defendant bears the burden of demonstrating why, on the basis of the law in effect at the time of trial, his or her trial counsel's performance was deficient. *See Bullock,* 791 P.2d at 159; *Carter,* 776 P.2d at 894; *Lovell,* 758 P.2d at 913; *Verde,* 770 P.2d at 118; *State v. Iacono,* 725 P.2d 1375, 1378 (Utah 1986) (per curiam); *State v. Malmrose,* 649 P.2d 56, 60 (Utah 1982). In support of his position, Dunn cites only *Hansen,* which was decided five years *after* his trial. Dunn does not argue that *Hansen* applies retroactively, nor do we see any reason why it should. *See State v. Norton,* 675 P.2d 577, 584 (Utah 1983), *overruled on other grounds, State v. Hansen,* 734 P.2d 421, 427 (Utah 1986); *cf. Van Dyke v. Chappell,* 818 P.2d 1023, 1025 (Utah 1991). Because Dunn has failed to demonstrate that the law at the time of his trial entitled him to an instruction on the prosecution's burden to prove the absence of his affirmative defense, his ineffectiveness claim fails.

We note that in *State v. Torres,* 619 P.2d 694 (Utah 1980)—not cited by Dunn's pres-

ent counsel—this court said that a defendant is entitled to a self-defense instruction informing the jury "that the defendant had no particular burden of proof but was entitled to an acquittal if there was any basis in the evidence from either side sufficient to create a reasonable doubt that the defendant was guilty of the offense." *Id.* at 695. However, even if this language is clear enough to establish that Dunn's trial counsel fell below the standard of reasonable professional assistance by failing to request the contested instruction, we cannot say that but for the error, there is a reasonable probability that the verdict would have been more favorable to him. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *Verde*, 770 P.2d at 119.

██ Finally, Dunn invokes the cumulative error doctrine by arguing that even if the errors committed during the course of his trial were harmless individually, they were cumulatively harmful. Under the cumulative error doctrine, we will reverse only if "the cumulative effect of the several errors undermines our confidence ... that a fair trial was had." *Whitehead v. American Motors Sales Corp.*, 801 P.2d 920, 928 (Utah 1990); *accord State v. Johnson*, 784 P.2d 1135, 1146 (Utah 1989); *State v. Ellis*, 748 P.2d 188, 191 (Utah 1987); *State v. Rammel*, 721 P.2d 498, 501–02 (Utah 1986). In assessing a claim of cumulative error, we consider all the identified errors, as well as any errors we assume may have occurred. We have performed this review in the instant case and conclude that the cumulative effect of the identified and assumed errors does not undermine our confidence in the essential fairness of the trial.

Dunn's conviction for aggravated kidnapping is affirmed. We remand the case to the trial court with directions to set aside the second degree murder verdict, to enter a judgment for reckless manslaughter, and to sentence Dunn accordingly.

HALL, C.J., HOWE, Associate C.J., and DURHAM, J., concur.

STEWART, Justice: (Concurring in Part and Dissenting in Part).

I agree with the majority that defendant's conviction for aggravated kidnapping should be affirmed but submit that instead of entering a judgment of manslaughter, the Court should reverse the second degree murder conviction and remand for a new trial.

In an opinion that is clearly result-driven, the majority adds a new legal maxim to statutory construction: When it's impossible to stretch a statute to fit the facts, ignore it and decide the case on an amorphous "general power." The result is an extreme example of flouting a statute that *on its face* should govern this case. More importantly, it is a violation of defendant's Sixth Amendment right to trial by jury, the very basis of the statute itself. *See Franks v. Alford*, 820 F.2d 345, 347 (10th Cir.1987); *Rose v. Clark*, 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986).

This Court initially affirmed Dunn's convictions in *State v. Dunn*, 646 P.2d 709 (Utah 1982). We subsequently held in a habeas corpus proceeding that Dunn was denied the effective assistance of counsel on appeal in violation of his rights under the Sixth Amendment to the United States Constitution. *Dunn v. Cook*, 791 P.2d 873 (Utah 1990). Accordingly, the majority addresses the issues now before it as if this were a direct appeal from Dunn's 1981 conviction.

The State concedes, as indeed it must, that the jury instruction on depraved indifference second degree murder was erroneous as a matter of law. For that reason, the second degree murder conviction must be set aside. The remedy for an erroneous jury instruction is a new trial. *See People v. Evans*, 182 Ill.App.3d 874, 131 Ill.Dec. 351, 354, 538 N.E.2d 726, 729 (1989), *aff'd sub nom. People v. Shields*, 143 Ill.2d 435, 159 Ill.Dec. 40, 47, 575 N.E.2d 538, 545 (1991); *State v. Stark*, 363 N.W.2d 53, 56–57 (Minn.1985); *State v. Allen*, 301 Or. 35, 717 P.2d 1178, 1181 (1986). Nevertheless, the majority, on its own, enters judgment against defendant for reckless manslaughter on the *theory* that manslaughter is a lesser included offense of second degree murder and, therefore, that the jury neces-

sarily found every fact required for a conviction of manslaughter. I submit that this Court does not have the authority to enter a judgment for manslaughter against Dunn on the facts of this case and that the majority blatantly violates his Sixth Amendment right to trial by jury in doing so. The proper remedy is to reverse and remand for a new trial on the second degree murder charge.

An appellate court's authority to enter judgment for a lesser included offense is spelled out in Utah Code Ann. § 76-1-402(5). That section authorizes an appellate court to direct entry of judgment for a lesser included offense if a conviction is reversed because (1) the court found insufficient evidence to support a conviction for the offense charged; (2) there is sufficient evidence to support a conviction for a lesser included offense; (3) the trier of fact necessarily found every fact required for conviction of that lesser included offense; and (4) the defendant seeks entry of judgment on the lesser included offense.

It is undisputed that the statutory requirements are not met in this case. First, the majority reverses Dunn's second degree murder conviction, not because of insufficient evidence as specified in the statute, but because the jury instruction on depraved indifference second degree murder was faulty. Second, the jury did not necessarily find every fact required for the conviction of manslaughter. Third, Dunn has not sought entry of a judgment for a lesser offense.

In stunning disregard of basic principles of judicial responsibility, the majority simply abandons the requirements of § 76-1-402(5) and relies on a "general power to modify judgments on appeal," even though it does not in fact modify a judgment, but enters a new one. The majority seeks to justify its position on the plainly expedient reason that "the obstacles to retrial on the second degree murder charge would be great," if not impossible, after ten years. The standard for determining whether a defendant is entitled to a new trial is not,

and has never been, the difficulty of retrying the defendant due to the passage of time.

The majority asserts authority to enter a judgment of conviction for manslaughter under Rule 28 of the Utah Rules of Criminal Procedure, which indicates that this Court may modify a judgment on appeal. Citing to other courts that have relied on a general power to modify judgments, the majority concludes that we also "may enter judgment on a lesser included offense when an error has tainted the conviction for the greater offense." But that is precisely what § 76-1-402(5) addresses and disallows in the circumstances of this case. Not one of the cases cited by the majority gives a court authority to act contrary to a governing statute such as § 76-1-402(5). Furthermore, none of those cases holds that a court can enter a judgment of conviction on facts similar to the facts of the case, irrespective of a statute.

A defendant charged with a serious crime has the right to have a jury determine his guilt or innocence. *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). The essential requirements of § 76-1-402(5) are mandated by the Sixth Amendment right to trial by jury. The majority maintains that it is irrelevant whether Dunn's conviction for second degree murder was reversed because the evidence was insufficient, as required by the statute, or because the instruction was erroneous. That distinction, however, is essential if a defendant's right to a jury trial is to be maintained. When a jury has been erroneously instructed on the mens rea necessary to convict a defendant of second degree murder, the defendant is entitled to have a *jury* determine his guilt or innocence under the correct legal standard.

The jury in this case was instructed that it could convict Dunn of second degree murder if he (1) intentionally or knowingly caused the death of Sprinkle or (2) acted under circumstances evidencing a depraved indifference to human life. The instruction on an intentional or knowing killing was

correct; it was incorrect with respect to depraved indifference. Because a general verdict was returned, this Court cannot possibly know whether the jury convicted Dunn of intentionally killing Sprinkle or of causing Sprinkle's death by depraved indifference. If the jury convicted Dunn of intentional murder, which it appears to have done from the evidence, it need not have found, and probably did not find, that Dunn acted recklessly. Therefore, the majority is simply wrong in saying that the jury necessarily found all the elements of reckless manslaughter.

There is clear evidence that Dunn intended to kill Sprinkle. If he did, as the *jury* apparently found, Dunn is guilty of intentional second degree murder. Whether the jury could have found Dunn guilty of second degree murder based on "depraved indifference" conduct is at best highly problematical, because that would have required a finding of a type of reckless conduct. It is clear that Dunn was not present when Scott killed Sprinkle in the back of the camper because Dunn was driving at the time. If the basis for Dunn's conviction was his telling Scott to kill the victim, that act was done intentionally, and Dunn was guilty of second degree murder. Thus, Dunn's acts did not recklessly create a risk of death, as required by the manslaughter statute. In holding Dunn liable for recklessly causing Sprinkle's death on the basis of Scott's intentional killing, the Court not only assumes the role of the jury, but also distorts the definition of reckless conduct and makes Dunn *vicariously* guilty of manslaughter for another's intentional killing, an entirely new and extremely troubling concept.

The majority erroneously asserts that the jury necessarily found every element required for a conviction of reckless manslaughter. The majority's *theory* is that reckless manslaughter is always a lesser included offense of second degree murder and that a conviction of second degree intentional homicide necessarily means that a jury found reckless conduct by the defendant. Some of our prior cases state that manslaughter is a lesser included offense of second degree murder, and in some cases it can be. *E.g., State v. Crick*, 675 P.2d 527, 530 (Utah 1983); *State v. Bindrup*, 655 P.2d 674, 676 (Utah 1982); *see also State v. Day*, 815 P.2d 1345, 1348 (Utah Ct.App.1991). Nevertheless, in cases where the mens rea of second degree murder is intent and the mens rea of manslaughter is recklessness, manslaughter is not a lesser included offense. If the right to trial by jury is to be preserved, it cannot automatically be assumed that manslaughter is a lesser included offense of second degree murder simply because it is a less serious crime.

*Franks v. Alford*, 820 F.2d 345, 347 (10th Cir.1987), is similar on its facts and applies the rule of law that the majority ought to apply here. In *Franks*, the Tenth Circuit held that an Oklahoma appellate court violated the defendant's right to trial by jury when it reduced his conviction from first to second degree murder. *Id.* A jury had convicted the defendant of felony murder, which made the defendant's state of mind with respect to the homicide irrelevant. The Oklahoma Court of Criminal Appeals reversed, holding that the facts did not support a conviction of felony murder. The court then held that the evidence supported a conviction of second degree murder and entered judgment for that crime. The Tenth Circuit held that the Oklahoma court erroneously assumed that "depraved mind" [i.e., reckless] second degree murder is a lesser included offense of first degree felony murder, which required intent. *Id.* The court stated:

> When a jury convicts a defendant of the offense charged, it thus necessarily finds all the elements of a true lesser included offense. Under those circumstances, a reduction on appeal to the lesser included offense does not run afoul of the Sixth Amendment because the *jury* has found all the elements of the lesser offense. *See, e.g., Morris v. Mathews*, 475 U.S. 237 [244-46], 106 S.Ct. 1032, 1037-38, 89

L.Ed.2d 187 (1986). *In this case, to the contrary, "depraved mind" murder is not a lesser included offense of felony murder because it requires proof of a mental state that felony murder does not.*

*Id.* (emphasis added). The italicized part of the quotation applies four-square to the instant case.

In *Rose v. Clark*, 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986), the United States Supreme Court made clear that a trial court violates the Sixth Amendment if it directs a verdict for the prosecution, no matter how "overwhelmingly the evidence" may point to a guilty verdict. The Court stated:

> We have stated that "a trial judge is prohibited from entering a judgment of conviction or directing the jury to come forward with such a verdict ... regardless of how overwhelmingly the evidence may point in that direction." *United States v. Martin Linen Supply Co.*, 430 U.S. 564 [97 S.Ct. 1349, 51 L.Ed.2d 642] (1977) (citations omitted). *Accord, Carpenters v. United States*, 330 U.S. 395 [67 S.Ct. 775, 91 L.Ed. 973] (1947). This rule stems from the Sixth Amendment's clear command to afford jury trials in serious criminal cases. *See Duncan v. Louisiana*, 391 U.S. 145 [88 S.Ct. 1444, 20 L.Ed.2d 491] (1968). Where that right is altogether denied, the State cannot contend that the deprivation was harmless because the evidence established the defendant's guilt; the error in such a case is that the wrong entity judged the defendant guilty.

*Id.*

Dunn has a Sixth Amendment right to demand that a jury, not this Court, make the determination as to his innocence or guilt. The majority denies him that right. It also makes him vicariously liable for manslaughter based on another's intentional killing. This case ought to be remanded for a new trial.